# C. A. TEMPLE v. STATE.

No. 2997.    Opinion Filed November 7, 1918.

Rehearing Denied November 9, 1918.

(175 Pac. 733.)

1. **JURY—Challenge for Bias—"Impartial Jurors"—Statute.** In a prosecution for larceny of livestock, jurors impaneled for the trial may be challenged for actual bias, where it appears that on the day before they had rendered a verdict convicting the same defendant of forgery, where it appears that the testimony in the first case involved certain controverted questions of fact in issue in this case, and where the same witnesses will be called to give the same testimony on an issue the same in both cases. Such jurors are not "impartial" jurors, within the meaning of the Constitution and laws of this state.

2. **JURY—Competency—Question for Court.** The competency of a juror is, under the statute, a question to be determined by the trial court in the exercise of a sound discretion. The discretion given, however, is not intended to deprive the defendant of his right of trial by an impartial jury, and the statute cannot be regarded as changing in any degree the essential qualifications which jurors must possess.

3. **JURY—Impartiality of Juror—Duty of Trial Court.** Whenever the fairness and impartiality of a juror is called in question, the trial court must be clearly satisfied that such juror is fair and impartial, and it is the duty of the trial court to resolve all doubts on this question in favor of the defendant.

4. **JURY—Voir Dire Examination—Latitude.** A liberal latitude should be given the defendant in the examination of jurors on their voir dire.

5. **WITNESSES—Transcript of Testimony—Absent Witness—Predicate.** Proof of predicate for the introduction of the transcript of the testimony of an absent witness taken upon the preliminary examination held incompetent and insufficient.

6. **EVIDENCE — Conviction — Weight of Evidence.** Defendants should not be convicted upon mere suspicion of guilt or even strong probabilities of guilt; to warrant their conviction, the testimony, when the whole is considered, should be clear and convincing, entirely satisfying the minds and consciences of the jury.

*Appeal from District Court, Atoka County;*
*J. H. Linebaugh, Judge.*

C. A. Temple was convicted of cattle theft, and he appeals. Reversed.

The plaintiff in error, Temple, and Ben Jordon were jointly informed against for the theft of two steers, the property of C. C. Stewart. A severance was granted and the state elected to first try the defendant Jordon. He was tried, convicted, and sentenced to the penitentiary for a term of ten years. Upon the trial of the defendant Temple, generally known as Tom Temple, he was found guilty, but the jury failed to agree upon his punishment. On November 29, 1916, the court sentenced him to imprisonment in the penitentiary for the term of five years. Unable to give *supersedeas* bond, he was committed to the state penitentiary.

The proof on the part of the state, briefly stated, is as follows:

C. C. Stewart testified that he lived near the southeast corner of Atoka county, and was the owner of six work steers; that in November he missed two of these steers; that about the 1st of January he found his steers in Webb's feed pen at Hugo; that they were taken without his knowledge or consent.

Otis Morgan testified that he lived near Farris, in Atoka county; knew the defendant Ben Jordon, and bought cattle from him at different times, including two steers, which he paid for by a check signed by his father, J. S. Morgan; on the request of Ben Jordon, he made the check payable to Ben Willis; that he bought the steers in Atoka county, and there gave the check to Ben Jordon. He identified the check and it was offered in evidence. It was

dated at "Hugo, Okl., 11-30.  First National Bank:  Pay to Ben Willis or order $70.00 Seventy Dollars.  [Signed] J. S. Morgan."  Indorsed, "Ben Willis."  He drove the steers to Hugo.  He was then asked:

"State whether or not you know where John Morgan is.  A. He is in Texas.  Mr. Jones: Objected to unless he knows of his own knowledge.  The Court: He stated that he did.  Mr. Jones: We except."

O. P. Ray, Jr., sheriff of Atoka county, testified as follows:

"Q. I will ask you to state if you, as sheriff of Atoka county, have made any effort to locate John Morgan?  A. Yes, sir.  Q. Did you find him?  A. Yes, sir."

The state then offered a subpœna issued for John Morgan to the sheriff of Choctaw county, with the return thereon of O. P. Ray, Jr., sheriff of Atoka county, that he could not find the within-named John Morgan in Choctaw county.  Over the defendant's objections the same was admitted in evidence.  He further testified that he found the steers in question in a feed lot at Hugo, and notified the owner, Mr. Stewart.  Recalled, he further testified as follows:

"Q. You are the same Mr. O. P. Ray that testified here yesterday in the case of the state of Oklahoma against C. A. Temple, the defendant here, charged with the crime of forgery, are you not?  A. Yes, sir.  Q. Was the testimony you give in this case in regard to this case—given—all of it—in the other case?  A. No, sir."

Proper objections were made and exceptions reserved.

Russell Telle testified that he was deputy court clerk and as such took the testimony in the preliminary examination in the case of State of Oklahoma v. Tom Temple and Ben Jordon, and produced a transcript of the testi-

mony of John Morgan, witness for the state in said examination; that the same was a correct transcript. Over the defendant's objection that no proper predicate ha l been proven, the same was read to the jury. His testimony on the preliminary examination was that he was in the butcher business at Hugo, and his son Otis Morgan bought cattle and handled them for him on his farm in Atoka county; that his son delivered some cattle in November, including two work steers; that on or about the 15th of December he had a conversation with the defendant Tom Temple at Hugo about the check that his son gave for these steers, and Temple said he had been to the bank, and found that he did not have enough money in the bank to pay the check for his cattle; that he went to the bank, and told them to pay the check. On cross-examination he stated that he had met Tom Temple but a few times; that he knew Charley Norris, who was with Tom Temple at the time, but didn't know whether it was Tom Temple or Charley Norris that went to the bank with him to cash the check; that Henry Colbert was present when they were talking about the check; that he formerly knew a Ben Willis that lived near Farris.

Henry Colbert testified that he worked for John Morgan in his butcher shop about the 15th of December, 1914, and Tom Temple was there about that time, but he did not understand what they were talking about.

For the defense several witnesses testified that they were well acquainted with the defendant, and knew he could not read or write except to write his name.

C. B. Memminger testified that he was cashier of the Atoka State Bank, and knew the custom of banks in cashing checks, and that, if a person should present a check for payment that purported to be payable to any person

other than the one presenting it, the bank under the rule would require the person presenting the check to indorse the same. To the same effect was the testimony of James Hudspet, cashier of the Oklahoma State Bank.

Two or three witnesses, including the court clerk, qualified as experts in handwriting, and were asked to compare the signature of the defendant with the indorsement on the check, and to state their opinion whether or not both were written by the same person. Objections by the county attorney to this evidence were sustained by the court.

The defendant, as a witness in his own behalf, testified that he was 33 years old, a resident of Atoka county; had lived in and around there all his life; that he never had anything to do with the $70 check introduced in evidence; the first time he ever saw the check was at the examining trial; that he had never had the check in his possession and did not cash or get the money on it at Hugo; that he could not read or write, but could sort of halfway sign his name, so that people could understand it; that he knew John Morgan, but never had any conversation with him in regard to the two steers in question; that he was not at Hugo on or about the 15th day of December; that at one time he sold Mr. Morgan a couple of heifers, and received a check for $50, and he took it to the bank at Hugo, and they said Mr. Morgan had not money enough there to pay it with, and he went to Morgan's market, and he took the check and gave him the money for. it. Cross-examination was in part as follows:

"Q. Was Ben Jordon working for you in November and December, 1913? A. He was not. Q. State if he was living out there with you? A. Sometimes he stayed at my house. Q. State if it is not a fact that you knew this case

was set for trial in November and you knew you had a forgery case against you? A. Yes, sir. Q. And you were not here? A. No, sir. Q. When you started back was when the sheriff got you in the state of Washington? A. I had started back from Seattle and had gone about three hundred miles. Q. You were convicted of a felony the other day, were you not? A. That is what I would call it."

State's rebuttal:

Ben Jordon, as a witness for the state, testified that he was charged jointly with Tom Temple with the larceny of the two steers; that he took the steers and sold them to Otis Morgan, and received a check for $70 and gave the check to Tom Temple; that he was working for Temple at the time; that there was no understanding between him and Temple that he was to steal these steers, and he never had any talk with Temple about stealing any steers; that he is now serving a term for stealing these steers; that he had served a term in the penitentiary at Leavenworth for manslaughter; that he found these steers ten or 12 miles from where the defendant Temple lived and no one was with him at the time.

Ben Willis was then called as a witness for the defendant, and testified that he was now serving a term in the penitentiary; that he knew Ben Jordon, and he received the check for $70 that was offered in evidence from Ben Jordon, and the indorsement thereon was witness' signature; that he cashed the check at the First National Bank at Hugo on the 15th day of December, 1914. Cross-examined, he was asked if he was in on stealing these steers, and said he was not; that the steers he gave Ben Jordon authority to sell were his steers; that he was now serving a term for bank robbery.

*Jones & McCasland* and *J. G. Ralls,* for plaintiff in error.

The Attorney General and *R. McMillan,* Asst. Atty. Gen., for the State.

DOYLE, P. J. (after stating the facts as above). The first question to be noticed in this case arises upon the rulings of the court in impaneling the jury. It appears that the defendant had been convicted of forgery by the verdict of a jury, returned the day before the trial of this case commenced, and these jurors were called as trial jurors in this case. On their *voir dire* each of these jurors was asked this question:

"Q. After you hear Sheriff Ray testify in this case, if he testifies to the same state of facts that he testified to in the other case, would that influence you one way or the other in passing upon these same facts, if they were controverted? The County Attorney: Objected to. The Court: Objection sustained."

Each of these jurors was in turn challenged for cause. In reply to questions by the court, these jurors said that they had formed no opinion of the guilt or innocence of the defendant. The court overruled the challenges for cause.

When the defendant had exercised all but one of his peremptory challenges, he requested the court to permit him to ask each member of the jury that served in the forgery case—

"if they have any fixed opinion as to whether or not the facts testified to by Mr. Ray in that other case are true. We desire to ask it for the purpose of basing a peremptory challenge. The Court: The request will be refused. Exercise your last challenge. Mr. Jones: We waive it."

To each of these rulings the defendant then and there reserved exceptions.

The purpose of the examination of a juror on his *voir dire* is to ascertain whether there are grounds for a challenge for either actual or implied bias; also to enable the defendant to exercise intelligently his peremptory challenges. Our Procedure Criminal provides that, upon the trial of a challenge, the juror challenged may be examined as a witness to prove or disprove the challenge and is bound to answer every question pertinent to the inquiry. Section 5864, Rev. Laws 1910. This court has uniformly held that a liberal latitude should be given the defendant in the examining of jurors on their *voir dire*. Under the statute the defendant had the right to ascertain, by appropriate questions, the effect or influence, if any, the hearing of the testimony in the forgery case had upon the minds of these jurors, where such testimony might reasonably be expected to be introduced on the trial of this case. The questions were proper and pertinent for the purpose of ascertaining the competency of such jurors, and, assuming that the answers to the questions propounded would not have furnished sufficient grounds for a challenge for cause, the inquiry would then be proper and legitimate for the purpose of enabling the defendant to intelligently exercise his peremptory challenges. It follows that the court erred in sustaining the objections thereto. Likewise it was error to refuse permission to ask these jurors if they had formed any impression or opinion as to whether or not the facts testified to by a witness in the forgery case, who would be a witness in this case, were true.

Upon a careful examination of the record, we have reached the conclusion that the jurors who had agreed to

a verdict of guilty in the forgery case were not impartial jurors, under the meaning of our Constitution, and that it was a manifest abuse of discretion to overrule the challenges to said jurors on the ground of actual bias. Under the Constitution and laws of this state, it is a fundamental principle that fairness and impartiality are prerequisite qualifications in all jurors who are called upon to try a defendant in a criminal action, and no jury can in truth be said to be fair and impartial when this principle has been transgressed in selecting such jury.

Section 5858, Code of Crim. Proc. (Rev. Laws 1910), defines as one ground of challenge to a juror—

"the existence of a state of mind on the part of the juror, in reference to the case, or to either party, which satisfies the court, in the exercise of a sound discretion, that he cannot try the issue impartially, without prejudice to the substantial rights of the party challenging."

It appears that the testimony in the former case involved certain controverted questions of fact in the trial of this case. The flight of the defendant as evidence of guilt and his ability to read and write were in issue in both cases. It may be possible that a juror may be so peculiarly constituted that the rendition of his verdict in the one case would have no influence upon his action in the other, but this question must be disposed of upon the assumption that all jurors possess the characteristics common to ordinary men. A fair trial cannot be had except by an unbiased jury, and jurors who have passed upon the credibility of witnesses in the one case are disqualified and incompetent as jurors in a case where the same witnesses will be called to give the same testimony on an issue the same in both cases.

The competency of a juror is, under the statute, a question to be determined by the court in the exercise of a sound discretion. The discretion given, however, is not intended to deprive the defendant of his right of trial by an impartial jury, and the statute cannot be regarded as changing in any degree the essential qualifications which jurors must possess.

Section 5861, Code of Crim. Proc. (Rev. Laws 1910), provides:

·    "No person shall be disqualified as a juror by reason of having formed or expressed an opinion upon the matter or cause to be submitted to such jury, founded upon rumor, statements in public journals, or common notoriety, provided it appears to the court, upon his declaration, under oath or otherwise, that he can and will, notwithstanding such opinion, act impartially and fairly upon the matters to be submitted to him."

The fact that these jurors stated on their *voir dire* that they had formed no opinion as to the guilt or innocence of the defendant, and that they could and would act impartially and fairly upon the matters to be submitted to them, was wholly immaterial. They could not be the judges of their own impartiality. They had received the evidence in the former case in the most solemn form and rendered a verdict. They had thus formed and expressed an opinion on some of the facts on which the defendant was to be tried, and were therefore disqualified. Our construction of the statute is that when the opinion is formed in this manner—that is, from hearing the facts of the case testified to—the examination of the juror must cease. He is incompetent.

It has been the uniform holding of this court that, whenever the fairness and impartiality of a juror is called

in question, the trial court must be clearly satisfied that such juror is fair and impartial, and it is the duty of the trial court to resolve all doubts on this question in favor of the accused.

The only testimony tending to connect the defendant Temple with the theft of the cattle was the testimony of John Morgan taken at the preliminary examination and read to the jury from the transcript.

Counsel for the defendant contend that the evidence to prove the predicate for the introduction of said transcript, admitted over their objections, was incompetent and insufficient. Considering the competency of the testimony as it is met by the objections urged, it appears that Otis Morgan was, without showing his competency, permitted to testify that John Morgan was in Texas, and for this reason the court erred in overruling the objection thereto. It also appears that the return on a subpœna issued for John Morgan to the sheriff of Choctaw county, made by O. P. Ray, sheriff of Atoka county, showing that the witness John Morgan could not be found in Choctaw county, was admitted. Obviously the court erred in overruling the defendant's objection thereto. The subpœna had not been issued to the sheriff of Atoka county, and his return thereto was incompetent and inadmissible for any purpose. This was all the evidence introduced to prove a predicate, and was wholly incompetent and insufficient to prove the same. It was therefore prejudicial error to permit the transcript of the testimony of John Morgan to be read to the jury. Without the testimony of John Morgan the evidence is wholly insufficient to sustain a conviction, and, even if Morgan's testimony was admissible, it is apparent that the evidence in the case is not that clear and convincing proof of the guilt of the defendant which

would warrant his conviction. Its tendency, at most, is only calculated to create a suspicion that he was implicated in the theft of the cattle.

Defendants should not be convicted upon mere suspicions of guilt, or even strong probabilities of guilt. To warrant their conviction, the testimony, when all considered, should be clear and convincing, entirely satisfying the minds and consciences of the jury.

For the reasons stated, the judgment is reversed.

ARMSTRONG and MATSON, JJ., concur.