RAYBURN MORRIS v. STATE.

No. A-9566.   Nov. 16, 1939.
(96 P. 2d 88.)

148

J. H. Warren and B. D. Jordan, both of Hugo, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for the State.

DOYLE, P. J. By information appellant, Rayburn Morris, Malcolm Keene and "Smoky" Bill Horne were jointly charged in the district court of Choctaw county with the murder of John Hammock, alleged to have been committed in said county on or about the 5th day of October, 1933, and further charged substantially that said defendants, acting conjointly and together, did then and there willfully, and feloniously conspire to rob one John Hammock, and acting together in pursuance of said conspiracy, and by the use of a pistol, had and held in the hands of said defendants, did place the said John Hammock in great bodily fear, and did then and there take from his person and against his will, the sum of $42, and five cases of whisky, and while engaged in the commission of said felony, they, the said defendants, then and there and acting together, did, willfully, unlawfully and feloniously, and with a premeditated design to effect the death of the said John Hammock, then and there shoot said John Hammock, inflicting certain mortal wounds

upon him from the effect of which said wounds said John Hammock did linger and die, as was intended by said defendants.

Upon his separate trial the jury found him guilty of murder and assessed the punishment at imprisonment in the penitentiary for life at hard labor.

His motion for a new trial was denied on April 18, 1938. From the judgment rendered in pursuance of the verdict, he appeals.

We shall first consider the assignment of error, that the verdict of the jury is contrary to law and is not supported by the evidence, in that there is no evidence to corroborate the testimony of the witness, Malcolm Keene, codefendant, who had previously been tried and convicted of murder, as charged in the information.

As this is the only substantial question raised on this appeal, we will state the evidence in some detail.

The record shows that the testimony of Malcolm Keene, the first witness called, was relied upon by the state to show the circumstances of the killing. His testimony was substantially as follows:

"I have known Rayburn Morris for 20 years. On the 4th day of October, 1933, I was working at Dennis Gibbs' blacksmith shop at Bonham, Tex.; Rayburn Morris came there to see me; Bill Horne was with him. He said that they were going after a load of whisky, and the way they were going to get the whisky was to come over here and buy a load of whisky, and while he was in the house paying for it, I was to drive away with the load of whisky. I was to steal his car with the whisky in it. I saw him on the streets a few days before that, and that was what he was talking about, coming over here and getting the whisky. I was to come in Bill Horne's car by Arthur City

and Bill Horne and Rayburn were coming by Paris in Rayburn's car. I told them I would meet them on the square at 6 o'clock and I met them there. They said: 'Are you ready to go, there is 'Smoky's' car, full of gas and oil.' I told them I was going home, and I came down by Telephone, Tex., and met them at Hugo. On my way I stopped at Nell Owen's house and ate supper. I told her I was going after a load of whisky. She asked whose car I was in and I told her Bill Horne's, she asked me about Rayburn and Bill and I told her they were in Rayburn's car, going by Honey Grove. I left her place a little after 8 o'clock and arrived in Hugo a little after 9. I met Bill and Rayburn on the street in Hugo at the fire house, and stopped and talked to them, and we went back to the river to hunt some whisky, did not find anything that night. Bill Horne went up to see Hammock and he did not have any whisky that night. We came back to the tourist camp about midnight, rented a cabin and went to bed. Rayburn and Bill put up the money. · I did not have a penny myself. I was to drive the car off after they got it loaded, and I was to get one-third of the whisky. The next morning we left the tourist camp and had breakfast at Norton's cafe, then went to the mountains, trying to find some whisky, we took Bill's car to the mountains, and we went to John O'Keefe's house, the first house east of Ft. Townson on the hill. About the middle of the afternoon we came back to Norton's cafe and had dinner; then we went to the tourist camp. Bill went back to town and came back that night with a woman in the car, just as Rayburn and I were fixing to leave. Bill went back to town with the woman. About sundown Rayburn and I went to the river, we were waiting for Bill. We waited for him by Grant, under the railroad pass. Bill came and we went to the river, to a beer joint. After we got to the filling station and could not find whisky, old man Hammock had five cases, and Bill went up there, he knew the people, but he did not think that was enough to fool with. We went on down to the river, trying to find some. We talked there and decided we would come up and take that whisky off Mr. Hammock. Rayburn said he was not going back without some, and was going up and take that five gallons of whisky. He said for Bill

to go up and buy the whisky, and Rayburn to stay in the road and keep other cars away. The whisky was to be put in 'Smoky' Bill's car, and I was to come up and hi-jack 'Smoky', take the money and drive off with the whisky. Rayburn was to stay in the road with his car, so if we got into a jam he was to keep the other cars out of the way. I was to walk up while 'Smoky' was fixing to pay Mr. Hammock, and when 'Smoky' started to pay him I walked up and held him up and took the money off him, the whisky was already in the car, I made 'Smoky' and John Hammock get in the car and I drove down to the bridge a ways. I was to put 'Smoky' out first, Rayburn said to, and Rayburn was to pick him up. Rayburn was behind me. I was to come on down the road and put Mr. Hammock out. I put 'Smoky' out and drove down the road a ways and started to put Mr. Hammock out, but he jumped me up, and then hit me with a flash light. I could not get him to stop, and I shot him. I shot myself when I shot him. The bullet went through there and came out here (indicating his leg), he was still on me, but quit hitting me. The car went in the ditch. I backed out the car and had the gun, and he was holding on to the end of the gun, I told him to turn it loose, and he said, 'No, you will shoot me'. I said, 'No, I ain't going to shoot you, turn loose'. He said, you promise not to shoot me any more, I will turn it loose.' I said, 'I won't shoot.' and he turned loose. I told him to get out, and I backed the car out of the ditch and went on. I drove to Arthur City. I passed Bill and Rayburn the other side of Arthur City. When I was in the ditch they went by. After I passed them at Arthur City I turned west and went to a school house. That was where I was to leave the car. I was to get in with Rayburn and 'Smoky' and leave the car there and pretend somebody had stolen 'Smoky's' car. That was all of our plans. I drove the car behind the school house, they transferred the whisky to Rayburn's car, and Rayburn asked me why I did not get the old man's money. I told him I got all I wanted and more too. They went by and I got out at Nell Owen's house. They took all the whisky but half a gallon. Rayburn said he was going to Sherman that night and send a doctor back to Nell Owen's to dress my leg. Rayburn came back

to Nell Owen's once, I think it was Saturday. We had a talk, Rayburn and I. All the family was in the room. He told me to ask them to go out in the other room, that he wanted to talk to me. I asked them to go out and they did. Rayburn said 'Smoky' had gotten in jail, and said they were looking for me; he wanted me to get out of the way before the law got me. He said he could not get a doctor to come, or did not get him, and he told me about Bill Horne being in jail. That was a Ford roadster belonging to Bill Horne that I was driving. John Hammock was shot Thursday night, and the following Sunday night Rayburn came to see me while I was up in the woods. Martin Keene, his brother and Bill Anderson were with him. They all talked with Rayburn about my being shot. I tried to get him to take me somewhere and he would not do it, said he was afraid of being seen with me, knowing I was shot and knowing he was involved, and after he would not take me, I went across the field to a neighbor's house and stayed all night. The next day I got a boy to take me to Honey Grove to Ann Smith's house. I do not know what day it was, but on Friday the 13th, my brother brought me over here to Hugo and I gave up."

Orland Stephens testified:

"I have known Rayburn Morris nearly all my life, Smoky Bill Horne three or four years, and I know Malcolm Keene. A few days before John Hammock was shot I talked with Rayburn Morris, in Bonham, right by the First National Bank, Bill Horne and Malcolm Keene were with him, they talked about coming after a load of whisky and getting it without paying for it, Rayburn wanted me to come with him."

Bill Kilough testified:

"I saw Rayburn Morris and Bill Horne come there the day Malcolm Keene was working on a truck, they came there twice that day and talked to Malcolm Keene, I think the day was October 4, 1933, it was the last day I worked there. It was before John Hammock was killed."

John O'Keefe testified:

"I live a mile and three quarters northeast of Corinne. I know Rayburn Morris and he with two other fellows came to my house, Rayburn Morris said that they were hunting for whisky, that night John Hammock was shot."

Mrs. Mantooth, formerly Mrs. John Hammock, testified that on the night of the 5th of October, 1933, Smokey Bill Horne came to her house to get whisky from her husband, and he and her husband took four or five cases of whisky out of the house and put them in a car.

"The first time I saw my husband after that was in the Paris Sanitarium. He had a gunshot wound in the left side, and he died from the effects of the bullet wounds. My son-in-law, Joe Pettijohn, and his wife and Andy, one of my boys, were at home there that night. Mr. Pettijohn was asleep and my daughter, Mrs. Pettijohn, was up attending her baby, she now lives in Arizona, and my son Andy lives in Arizona, I have been getting letters from them there."

Thereupon the transcript of the testimony of Mrs. Joe Pettijohn, given at the preliminary examination, was offered in evidence. She testified:

"John Hammock was my father, I was at my father's place the night my father was shot, when these men came after the whisky I was up with my baby. Bill Horne came in, I knew him, and they took away five or six cases of whisky."

The state then offered in evidence the transcript of the testimony of Andy Hammock, given on the examining trial. He testified:

"I am 18 years old, I was about 14 when my father was killed, at that time I had known Bill Horne for a year or two, he came to the house that night, and got some whisky."

Lige Hammock testified:

"I am the son of John Hammock. I remember the time my father was shot. I went to the hospital with him, he was shot over the hip, coming out right side of the spine. He lived five days and died from the effects of that wound in the Paris Sanitarium. I was not at home that night."

Nell Irvin testified:

"I know the defendant, Rayburn Morris, when I see him; I was acquainted with Malcolm Keene and Bill Horne. At the time John Hammock was shot I was living on the Gross farm, six or seven miles from Telephone, Tex. I now live at Tishomingo, Okla.; I heard about John Hammock being shot. I saw Malcolm Keene two nights before he was shot. He came by the house. He said he was going to the river bridge to meet Rayburn Morris and Smoky Bill at Arthur City. He was traveling in a Ford Model A roadster. He said he was coming over here after liquor. He had a pistol in the car seat. I asked him what he was going to do with it. He said he might use it before he got back. He said they were going to hi-jack somebody out of it. That night he had supper with me and left, going towards the river. One or two nights after that he came back, and he was shot. He had a half gallon of whisky. That was Thursday night and he stayed until Saturday night. Rayburn Morris came to the house, when he came in he asked Malcolm to tell mother and I to leave the room, and we left the room. I heard a car when he came there; that was what woke me up. When we started out of the room I heard Rayburn say something had to be done, that they were after him and had Smoky in jail and he wanted Malcolm to leave."

W. V. Anderson testified:

"I live at Ivanhoe, Fannin Co., Tex. I am a brother-in-law of Malcolm Keene. I saw Rayburn Morris in Ivanhoe after Malcolm Keene was shot, Saturday October 7th. The next time I saw him was in Sherman, on Sunday, the 8th. That Sunday night he came to my house. I got in his car and we went south from Ivanhoe about three quarters of a mile, turned up the road east a half a mile,

and stopped to talk. I told him Malcolm Keene wanted him to get a doctor, and wanted him to come and see him. He said, 'What is the matter?' I said, 'You know what is the matter.' He said, 'Well, I will come down there.' He said, 'You may walk back to Ivanhoe.' I said, 'Why not go back to Ivanhoe?' He said, 'I don't want them to see me going north.' I said, 'Take me back to the good road.' He took me back to the good road, then went east. I didn't know but what he was going to where Malcolm was. At Sherman, Martin Keene was with us and Rayburn said, 'I will be there tonight', and that was about all that was said there, when I came back home that Sunday night the law had been there. My wife told me they were hunting Malcolm. In a few minutes Martin Keene and Rayburn came walking up, I said: 'Where is Malcolm?' He said, 'He is coming.' They came in and Malcolm wanted him to take him to a doctor. Rayburn said, 'I am afraid to take you, the law is here and I am afraid will catch us both.' I said: 'You can't stay here; if you do you are liable to get me in trouble for harboring.' They said, 'Well, let's go', and they left my house and went east to where Rayburn said his car was. That was Sunday night the 8th."

Martin Keene testified:

"I am a brother of Malcolm Keene. The first time I saw Rayburn Morris I went to his place in Sherman. It was Sunday. Bill Anderson was with me. My brother sent me over there. Bill Anderson and I were going down the street and heard some one whistle. I turned and saw Rayburn across the street. He motioned for us to come over. I walked over and started to tell him about my brother wanting him to come down and see him. Rayburn said: 'Well, don't say any more about it, my father and mother are in the house; I don't want them to know about it. I will be there tonight'. Bill Anderson and I got in the car and went home. He came to my house where my brother was supposed to be, but the laws from Oklahoma and Bonham came to my house while Bill and I were gone, and he was not there when I got back. Rayburn Morris came to my house that night, and said, 'Where is Malcolm?'

I said, 'Don't ask me, he is gone. He was here when I left. My wife said he went up through the woods.' He was shot through the leg. He was in bad shape and I was afraid got unconscious. I made two or three rounds but could not find him. When Rayburn came to my house he hid his car east of the graveyard. Rayburn and I walked around through the woods. I whistled and my brother' answered and we walked down and talked to him. My brother wanted a doctor to have his leg treated. Rayburn said: 'It won't do to get out, they are watching every move I make. The best thing to do is to lay close for a few days.' That was the last time I saw Rayburn and Malcolm together."

Ernest Steen testified:

"I have known Rayburn Morris four or five years. I remember the night that John Hammock was shot. At that time I was selling beer on the river. I saw Rayburn Morris, Smoky Bill and another fellow together, down there about 8 o'clock that night. They came to my place in Rayburn's car. Smoky Bill got out of the car, came in, got a bottle of beer and asked me if Mr. Hammock was my friend. I told him 'No, not in particular'. He said, 'Well, we are going to make him for a load of whisky tonight."

Charlie Waddington testified:

"I was sheriff when John Hammock was killed. I made some investigation and went over into Texas and at the Belk schoolhouse I found a Ford car. It was a roadster, parked back of the building. I found broken pieces of glass and a cap in the car, and there was blood in the car."

Cap Duncan testified:

"I am now sheriff of Choctaw county, at the time John Hammock was shot I was a deputy sheriff for Mr. Waddington, and went with him to the Belk schoolhouse, in Texas; there we found a Ford Model A Roadster, there was some blood in the car, and dried blood on the seat."

Malcolm Keene, recalled, testified as follows:

"Q. Malcolm, yesterday I don't think I asked: How much money did you get in that holdup? A. $42. Q. To whom did you give that money? A. Rayburn Morris. Q. How many cases of whisky did you get? A. Five cases."

When the state rested its case defendant interposed a demurrer to the evidence, on the ground that there is no testimony to corroborate the witness, Malcolm Keene.

Appellant did not elect to testify as a witness in his own behalf and there was no evidence offered on the part of the defense.

The evidence for the state is undisputed that the robbery and homicide were both committed as charged in the information.

Homicide is murder: "When perpetrated without any design to effect death by a person engaged in the commission of any felony." Penal Code, sec. 2216, 3d subd., 21 Okla. St. Ann. § 701, subd. 3.

The intent of the Legislature in enacting this subdivision was doubtless to class certain homicides as murder, without containing the ingredient of premeditated design or intention, which otherwise could not possibly be of a higher degree than manslaughter.

In Allen v. State, 16 Okla. Cr. 136, 180 P. 564, the court held:

"A homicide perpetrated without any design to effect death by a person engaged in the commission of a robbery, is * * * 'murder,' [within subdivision three of this section], although the robber did not intend to kill when he fired the fatal shot."

Where defendant's coconspirator killed decedent in perpetration of robbery, both are guilty of murder as pro-

vided by the third subdivision of the section, although neither had design to effect death. McDonald v. State, 54 Okla. Cr. 161, 15 P. 2d 1092.

A careful consideration of all the evidence in the case shows that not only was the evidence of the convicted codefendant, Malcolm Keene, abundantly corroborated, but if the testimony of said accomplice be eliminated there remains undisputed evidence sufficient to support the verdict of the jury. There was independent evidence showing the conspiracy to commit the robbery, and facts and circumstances showing that the defendants were acting in concert with a common purpose and intent in the commission of the robbery, and showing statements made by appellant, connecting him with the commission of the robbery, and that he became a fugitive from justice following the commission of the homicide by his coconspirator in the commission of the robbery. And that while he was a fugitive from justice he made admissions of inculpatory facts showing that he participated in the robbery in the commission of which the homicide was committed.

The proposition of whether or not a witness has been convicted goes only to his credibility.

The fact that one is jointly charged with the person on trial could have no greater effect. A codefendant is competent as a witness only at his own request.

The established rule in this jurisdiction is that when two or more persons are jointly charged with the commission of a felony and separately tried, each is a competent witness for or against his codefendant when he voluntarily elects to become such. Bryan v. State, 11 Okla. Cr. 180, 144 P. 392, 393.

Another assignment is that the court erred in permitting the transcript of the testimony of two witnesses

not present, taken at the preliminary examination, without fixing by competent evidence a proper predicate, why they are not present to testify.

The rule is well settled in this state that, where the testimony of a witness was given at a preliminary examination and his testimony taken by the reporter in the presence of the defendant and his counsel, who had opportunity to cross-examine, and such testimony is transcribed and filed with the court clerk, and if such witness is not present at the final trial, and the state shows such witness cannot with due diligence be found within the jurisdiction of the court, or is absent from the state, the testimony of the witness may be read to the jury. Clark v. State, 28 Okla. Cr. 31, 228 P. 791.

Without a detailed explanation, we hold that the showing made that both witnesses were out of the state constituted a sufficient predicate for the introduction of their testimony in this manner.

Another assignment is that the court erred in permitting witnesses to testify to conversations had with appellant and in admitting declarations and statements made by codefendants.

The testimony objected to was admitted by the court under the theory of the state that defendant, Morris, had conspired with his codefendants, Keene and Horne, to go across Red river into Oklahoma and there commit the alleged robbery.

Upon the theory of the state we are of the opinion that the testimony objected to was properly admitted.

In the case of Starr v. State, 5 Okla. Cr. 440, 115 P. 356, 364, it is said:

"The rule of law applicable to questions of this kind is well settled. In a trial for murder any evidence which fairly tends to prove a conspiracy between persons to commit the murder and the motive for the murder is admissible, although not tending directly to prove the murder charged in all cases, where such testimony tends to corroborate the testimony tending directly to prove the murder charged. It is not necessary that the prosecution establish beyond peradventure that the acts, declarations, or conduct of the alleged conspirators were based upon the conspiracy or in reference to the crime charged. It is sufficient if they harmonize with and tend to confirm the charge of conspiracy or show motive for the crime. If such acts, declarations, or conduct of the alleged conspirators could not be shown, unless the motive therefor, or the connection between the same and the crime, were made undisputably clear, the range of inquiry would be very limited. It is sufficient that such acts, declarations and conduct have an apparent or probable connection with the crime. The general rule is that where there is evidence of conspiracy to commit a crime, and of its subsequent commission, the prosecution may in support and corroboration thereof show acts, declarations, or conduct of the alleged conspirators intermediate of the conspiracy and the crime which apparently recognizes the existence of the conspiracy or reasonably indicates preparation or motive to commit the crime.

" 'Where a conspiracy is shown to exist, which is usually inductively from circumstances, then the declarations of one conspirator in furtherance of the common design, as long as the conspiracy continues, are admissible against his associates, though made in the absence of the latter. The least degree of concert or collusion between the parties to an illegal transaction makes the act of one the act of all.' 2 Wharton's Law of Evd. par. 1205.

" 'Slight evidence of collusion is all that is required.' 2 Rice on Evd. 865, § 333; 1 Greenleaf on Evd. (13th Ed.) § 111; Anarchist's Case [Spies v. People], 122 Ill. 1, 12 N. E. 865, 17 N. E. 898, 3 Am. St. Rep. 320."

In the case of Irvin v. State, 11 Okla. Cr. 301, 146 P. 453, 463, we said:

"Where there is evidence tending to show community of design between two or more persons for the performance of an unlawful act, the actions, and conduct, and statements of one of them are admissible in evidence in a prosecution against another of the conspirators for homicide alleged to have resulted from the conspiracy, and this is the rule though such acts were not done, or though such statements or declarations were not made, in the presence of the person against whom they were used.

"See note and cases collated People v. Lawrence, 68 L. R. A. 220.

"A conspiracy can seldom be established by direct and positive evidence. It is from the nature of the case, only evidence of circumstances tending to show conspiracy which ordinarily can be adduced. If there is testimony tending to show that the defendants pursued by their acts the same unlawful object, one performing one part and another another part of the same so as to complete it, with a view to the attainment of that same object, a sufficient and proper foundation has been laid for the admission of the acts and declarations of other conspirators made and done while the conspiracy was continuing in furtherance of the common design."

As to other assignments of error, counsel for appellant have cited the court to no authority supporting the contentions made. We consider the assignments wholly without merit.

The instructions of the court to which no objection was made or exception taken, fairly and correctly cover the law of the case.

A careful examination of the entire record leads us to the conclusion that the only debatable question in the case for the jury to consider was whether appellant's punishment should be death or imprisonment for life.

Our conclusion is that appellant had a fair trial with every right accorded to him that the law justifies or requires.

The judgment of the district court of Choctaw county herein is accordingly affirmed.

BAREFOOT and DAVENPORT, JJ., concur.