# LEETH v. STATE.

No. A-11306.   April 25, 1951.

(230 P. 2d 942.)

Wilkerson & Wilkerson, Pryor, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

POWELL, J. John Paul Leeth, J. R. Killion and Frank Wimer' were jointly charged by information filed in the district court of Mayes county with the crime of burglary, second degree. It appears that at the first trial the jury was unable to agree, and was discharged. The defendants thereafter each asked for a severance, and the same was granted. The state elected to try Leeth first, and he was by a jury found guilty of the crime charged and his punishment was fixed at two years imprisonment in the State Penitentiary. Appeal has been duly perfected to this court.

The specifications of error in petition in error are argued in briefs filed under three propositions, and being:

(1) That "The defendant was unduly restricted in the voir dire examination."

(2) That "The trial court permitted incompetent evidence to go to the jury, engaged in the trial of said cause over the objection of the defendant, to the defendant's hurt."

(3) That "The trial court did not in its charge to the jury cover every material issue in the case."

Considering proposition one, the record discloses that the name of one Christine Walker was endorsed on the information as a witness for the state. The case-made shows that after the jury had been selected and the trial was ready to commence, the following colloquy transpired between counsel for the defendant and the court:

"Mr. Wilkerson: May the record show, your honor, that in the voir dire examination the defendant propounded the following general question to the jurors: 'Are any of you gentlemen acquainted with Christine Walker, of Spavinaw, Oklahoma?' The Court: To which the county attorney interposed an objection, and it appearing that Christine Walker is not the prosecuting witness in this case, the court overruled the objection. Mr. Wilkerson: We call the court's attention to the fact that her name is endorsed upon the information as one of the witnesses for the State. The Court: The court takes the position the fact that she may be a witness, and the jurors might be, some of them, might be acquainted with her, is immaterial. Mr. Wilkerson: To which ruling on the part of the court, the defendant excepts.

This court has held that an examination of a juror on his voir dire has a two-fold purpose; first, to ascertain when a cause of challenge exists; and, second, to ascertain whether it is wise or expedient to challenge peremptorily. And the ruling of the trial court will be carefully examined in connection with the facts and circumstances peculiar with a particular case and as disclosed by the record; and, if it appears that the right of the accused to challenge a juror peremptorily was prejudicially impaired and resulted in the prevention of the defendant having a fair and impartial jury to try the charge against him, the error of the court will be held to constitute reversible error. Kizer v. State, 67 Okla. Cr. 16, 93 P. 2d 58, and Temple v. State, 15 Okla. Cr. 176, 175 P. 733.

In this case the record fails to show that the attention of the court was called on voir dire examination to the facts later revealed during the trial of

the case, that the witness Christine Walker was claimed to be an eyewitness to the burglary and that she was a niece of the man whose store was claimed to have been burglarized. The record fails to show that counsel objected to the ruling of the court at the time the question on voir dire was propounded, and fails to show whether defendant exercised any or all of his peremptory challenges, or made any challenge for cause. The record fails to show any effort of counsel to ask further and specific questions concerning any possible kinship or any other relationship of any prospective juror with Christine Walker. We have no evidence before us of any serious effort to convince the court of the possibility that there might be members of the jury panel who by reason of blood relationship or by reason of anything between the witness in question and some of the prospective jurors that might deprive the defendant of a fair and impartial consideration of his case by any such juror. Counsel could, out of the hearing of the jury panel, have advised the court of his reasons for attempting the line of questioning sought, and required the reporter to have made a record. Counsel might have convinced the court of the relevancy of the questions sought to be asked. But at all events, such record would have revealed whether or not the court was advised of the purpose of the line of questioning sought and had a fair opportunity to rule thereon, and at the same time would have presented such a factual history as would have materially assisted this court on appeal in treating the question raised.

It is true that the record discloses that the state's witness Christine Walker was a niece of the prosecuting witness and did work in a bar owned by one Doc Reynolds and that she and Reynolds lived at the same rooming house, but nothing presented by the record would justify even an inference of any relationship between such witness and any juror or jurors that might have prevented the defendant from receiving a fair trial. In the absence of further record, we must assume that the court had good reason for the ruling made. It may have been that the groundwork was being attempted that would enable the defense to get before the jury a surreptitious relationship between the witness and Doc Reynolds, and also the matter of the witness participating with her employer in the violation of the intoxicating liquor laws and other possible law violations. We so conclude from matters set forth in defendant's brief. The court, no doubt conscious of this, was persuaded to rule as he did in an effort to keep out prejudicial matters anticipated from the defense and having no bearing on the guilt or innocence of the accused of the crime charged.

No showing was attempted to be made by the defendant at the time of argument of motion for new trial that he was forced to trial before a prejudiced jury or that there was in fact anything in the relationship between any juror and the witness in question that might have influenced such juror or jurors one way or another in arriving at a verdict. While in light of the later record on trial, we consider the question asked on voir dire to have been a proper question, and that the court should have overruled the objection of the county attorney, yet in view of the facts and circumstances as presented by the record, we conclude that the ruling of the court does not constitute such an error as would justify this court, if this was the only error, in reversing the case.

On trial the state used three witnesses on direct and two on rebuttal; the defendant testified and used his two codefendants.

Christine Walker testified that she was 31 years of age and had lived at Spavinaw all her life; that during April, 1947, she was employed at the Ritz Bar, Spavinaw, operated by one Doc Reynolds; and located on the east side of Main street; that she had a room at a house about a half block north of the Ritz Bar: that the Walker store owned by her uncle, Ernest Walker, was located on the west side of Main street approximately 50 feet south and across the street from

the rooming house where she lived, and that she could from her bedroom see the front of the Walker store, which she estimated to be 150 feet away. She testified that the dimensions of the store were about 24′ x 60′; that there were two plate glass windows in the front with the door in the center. On the night of April 26 and the morning of April 27, there was a 200 watt electric light bulb burning in the center of the store and back from the door, the light from which was reflected on the sidewalk.

Witness further testified that on Saturday evening, April 26, the defendant John Paul Leeth and Frank Wimer and J. R. Killion (codefendants) were in and out of the bar until about the time it closed around 2 o'clock in the morning. And on cross-examination she admitted that she dispensed whisky by the drink along with the beer and that these men had been drinking. She denied that she drank liquor. She testified that Leeth had on khaki pants, a dark tie and a white shirt; that he was crippled in one leg and walked stiff-legged; that Wimer had on white trousers and that Killion had on a dark tan and brown sport jacket and tan trousers. Witness further testified that she occupied a front bedroom at the rooming house and stated that after she had turned out the lights and gone to bed about 2:30 in the morning in question, that:

"I first heard a noise and it sounded like it was around the grocery store, and I raised up and looked out, and I couldn't see anything; but I heard it again, and in a few minutes I saw some boys go around the corner and look in the window of the store."

She further stated that it was the south corner of the building that the boys went around and that a car came down the street and they went back of the building, but after the car passed they came back to the front and opened the screen door and it looked like they were trying to get in the building. The county attorney asked the witness:

"Describe in your own words now, Miss Walker, as to the clothes and description of the boys you saw walking around the south of the building and in front of the store by the screen. A. One had on a white shirt and a black tie and khaki trousers, and the other had on white trousers."

She further stated that she saw a third person on the north side of the store who had on dark clothes. He did not enter the store and was not between her and the store light. She was further asked:

"Q. Now, then, after this car had gone down the street, then what happened after that? A. They opened the screen and went into the door. Q. Approximately how far is the door from the screen? A. Oh, I don't know—a few feet. Q. Is that the door of the store? A. Yes, sir. * * * Q. After they opened the screen tell the court and the jury what happened after that. A. It looked like they might be trying to break the lock, and all of a sudden the door flew open and they went in the store. Q. Who went in? A. The one dressed in the white shirt and dark pants was in the lead. Q. Could you see him from your door? A. Yes, sir. Q. Who was that person? A. That person was John Paul. Q. John Paul Leeth, defendant? A. Yes, sir. Q. Was anybody else with him? A. Yes, sir. Q. Who was that? A. Frank Wimer."

Witness testified that she thereafter woke up Doc Reynolds who occupied a back room at the rooming place and that Doc went into the street as the two boys were leaving the store and shot in their direction two or three times, and the boys ran behind the north side of the building and that she went to wake up the store owner, her uncle Ernest Walker, who lived about a block and a half away. Mr. Walker returned to the store with her, and she found John Paul Leeth and Frank Wimer standing on the cattle guard near the store and the defendant Leeth had mud on one knee and Wimer had mud on the inside of his trousers. She stated that Doc Reynolds was present and she asked Leeth what

business he had breaking into that store, and he told her that she talked like a crazy woman.

Ernest Walker testified that he owned the store in question and that his niece Christine Walker woke him the early part of Sunday morning April 27, and that he went to his store with her and found the padlock to the front door broken and lying in front; that his cash register had been opened and $12 to $15 in change was missing; also some cigarettes; he recovered one carton of cigarettes after daylight, same being found outside the store. The burglars had also tried to open the back door of the store but gave it up. The entrance was through the front door. Witness found a hat at the west end of his building. It would not fit either of the persons charged with the burglary.

Fred Grimes, deputy sheriff, testified that he lived at Pryor and that he was called to Spavinaw after midnight or about sunup on the Sunday morning the Walker store was broken into; that the defendant had already been placed under arrest when he got there, but that he brought him to Pryor and placed him in jail. He came back Sunday morning and made a further investigation around the store. He stated that the ground was muddy and slick around the building; that some water was standing on the lot from recent rains; that it appeared from tracks that parties had left the front of the building in a hurry and had gone west down the north side of the building. He found some marked peculiarities as to some of the tracks. Said he: "The man who made those tracks in the green place is the man that taken a long start with one foot and a short start with the other." He stated that some of the tracks were made by a person with a defect in one leg. He further stated concerning the peculiarity of the tracks:

"Well, he would take a long step with his good leg, or his good limb, and a shorter step with the injured limb, or the stiff limb, and if he was in a hurry, which he was in this case up there, he pushes, or puts his tracks back. It happens in soft dirt or sand or in some places."

Witness further stated that the defendant had a defective leg, one being shorter than the other, and stiff, and that he would make tracks as above. The officer stated that he investigated as to who was with Leeth the night in question and arrested two more boys.

The defendant Leeth testified in his own defense. He stated that he was 25 years of age, single, lived with his mother at Strang; that on the afternoon of April 26, 1947, he went with Frank Wimer and two other boys in Wimer's pickup to Langley and then to Spavinaw, arriving about 8 o'clock in the evening, that he played a game of pool and visited at the Ritz Bar operated by Doc Reynolds and Christine Walker, about a dozen times; that they would drink and talk and then drink; that he drank whisky; that prior to the bar closing about 2 in the morning there was an argument and that it continued in the street after the bar closed. He stated that after the bar closed, J. R. Killion purchased some fritos and potato chips and they drove in Wimer's pickup to where Killion's car was parked in front of Doc Reynold's house, and there ate the fritos and potato chips; they were to push Killion's car to get it started; that Wimer and Killion went south to get a drink of water; that witness became ill and went to a filling station and the park gate nearby and threw up; that while there he heard some shots fired; that he walked back to Doc Reynold's house and Mr. Kendall let him in and he sought to purchase a pint of whisky; that Doc Reynolds held a gun on him and made him march over to the front of Walker's store; that Mr. Walker and Christine soon came up and that Christine accused him of breaking into the Walker store and he told her she talked like a crazy woman; that thereafter he returned to Wimer's pickup across the street and

soon Wimer and Killion walked up from the south.  He denied breaking into the Walker store.  He claimed that he got mud on his shoes and knees by reason of getting down on his knees to throw up near a truck.

J. R. Killion testified that he was 26 years of age, married, that he spent the evening of April 26 in Spavinaw roaming around; having a few drinks of whisky and danced, was present when the bar closed; that he got in Frank Wimer's pickup, his car being parked in front of the place where Doc Reynolds lived, that they got some fritos and potato chips and drove in the pickup to where his car was parked a short distance up the street; that Wimer became sick and that he went with him south across the cattle-guard and about 500 yards to a seep from which water was piped and gave Wimer's head a soaking, and that thereafter they came back to his car and they found Doc Reynolds and Leeth and it was claimed that Walker's store had been broken into and Doc accused Leeth.  He claimed that he purchased a pint of whisky from Doc and opened it up and several took a drink with him, including Christine.  He asked Christine if she thought they were the ones that broke into the store and she stated she did not think so; that he then went home and the next day he was arrested at his home.  He denied breaking into the Walker store or that he was present when anyone else broke in.  Witness denied ever seeing Leeth and Wimer go across to the back or south side of Walker's store, but stated they might have done so earlier in the evening.  On cross-examination witness admitted that he had been in the county attorney's office on April 13 or 14, 1949, but denied that he told the county attorney that when he pulled in beside Wimer's pickup that Leeth and Wimer went across the street and that he tried to get them not to do so, and denied that he had stated that the last time he saw them was when he went to the water hole and that they were in the store.  He denied stating that after the shots were fired that Leeth and Wimer ran out back and laid down.

Frank Wimer testified substantially as J. R. Killion as to the happenings around the Ritz Bar and Walker's store.

Walter Deer, deputy sheriff, who placed Leeth under arrest, testified as to other boys being on the street of Spavinaw after midnight on the morning of April 27, 1947.

The state on rebuttal called Deputy Sheriff Fred Grimes, who testified that on the Saturday night before the trial and around 8 o'clock he was on the stairway of the courthouse and saw J. R. Killion go with County Attorney Burress into his office, and that witness, who had off his shoes, came down the stairs and listened at the county attorney's door.  Witness was asked: "What did he [Killion] say, Mr. Grimes, in regard to the burglarizing of Walker's store?  A. Well, he just told you that he saw them enter the building there at the door, and he also saw them go into the store."  Counsel objected to the question and answer, but the court admitted this testimony for the purpose of impeaching the witness Killion.  We conclude that the court was correct in this ruling.

The state next called Marion Son, a deputy sheriff, and proved by him that on the night that J. R. Killion visited the county attorney's office witness had rigged up a wire recorder, which he identified, and he testified that the recorder was the property of Mayes county and that when the county attorney went to let Mr. Killion in that he turned it on.  He identified the microphone which he stated was connected to the recorder; that he had an hour spool of wire on the recorder, and being the only hour-spool he had.  He testified that no one else had anything to do with the recorder or wire except himself.  The county attorney asked permission of the court to have the wire played in hearing of the jury for the limited purpose of impeaching the witness Killion.  The court stated:

"And gentlemen of the jury, you are advised that the court is admitting the statement not as evidence against the defendant now on trial. You are not to consider the evidence as against this defendant, but it is being admitted solely and only for the purpose of enabling you to determine whether or not this witness, Killion, had told us the truth on the stand here. It is being admitted for impeachment purposes and that is all it is being admitted for. Killion is not on trial in this case, and the testimony isn't being admitted as against this defendant on trial, but is admitted solely to enable you, as to whether you believe Killion when he made the statement here, or whether he told you the truth here on the stand this morning."

The recorder was played to the jury instanter without the court having the same first played in the absence of the jury in order that it might be determined if there might or might not be prejudicial matter. The court reporter failed to take the conversation down as it was played.

The recorder reproduced a conversation supposedly between the county attorney and J. R. Killion in which Killion admitted that he saw Leeth and Wimer enter the Walker store and saw them come out together and leave. He stated that he never got on the west side of the street, but did go to a filling station. He stated:

"When I met Frank [Wimer] at the filling station, he wanted me to wait a few minutes, and in the meantime John Paul [Leeth] went back. I didn't know why in the hell he was waiting down there, but I met Frank at the filling station and he wanted me to wait a few minutes, and in the mean time John Paul came back. I don't know why in the hell I waited so long in the first place."

Witness further identified the way Leeth and Wimer were dressed. These statements were contrary to the statements actually made on the witness stand. We conclude this part of the recording was admissible, strictly for impeachment purposes. However, the county attorney expressed himself to Killion (in an apparent attempt to encourage him to talk) to the effect that John Paul Leeth was the man responsible for the breaking and was the man he wanted most to convict. What the county attorney thought was not an issue in the case. Many jurors, by reason of the high office of the state's attorney, might have accepted his view, however, rather than reach a conclusion based on the evidence introduced. Killion had stated that Wimer was so drunk that he did not know what he was doing and had followed Leeth. There was much unnecessary and irrelevant conversation mixed in with the relevant and competent impeachment statements.

The court should have first had the wire recording played in the absence of the jury, and then have had the wire played so as to skip, or have had deleted, all statements by the county attorney as to his opinion as to the guilt or innocence of the defendant, and to have had skipped or deleted all other incompetent remarks, prior to permitting the jury to hear the recorded conversation. If the reporter had first transcribed the recording, and then taken down and transcribed that part of the recording actually heard, the record then presented to this court would have enabled it to better pass on the objections raised. But here the jury heard the entire recording, which included prejudicial matter, although the wire was never introduced in evidence.

In Pebworth v. State, 88 Okla. Cr. 97, 199 P. 2d 621, 622, this court said:

"It is the duty of the county attorney to see that nothing but competent evidence is submitted to the jury, and it is a grave breach of duty to seek by innuendo or artifice to procure a conviction by injecting into the case any material facts or conclusions not based upon the evidence adduced at the trial."

Also, in Kizer v. State, 67 Okla. Cr. 16, 93 P. 2d 58, 90, we said:

"It was improper for the county attorney to state his personal opinion as to the defendant's guilt or to state facts not proved by evidence or otherwise given before the jury, that which amounts to his own opinion."

We conclude that by reason of the prejudicial matter set out and contained in the wire recording and which the jury was permitted to hear, the defendant was deprived of a fair trial, and the error being fundamental, this case must for such reason be reversed.

Nevertheless, we shall treat the remaining issues presented which may be of value when this case is retried.

Recently, this court has held in a case where a voluntary confession was recorded, that such recording was admissible in evidence. See Williams v. State, 93 Okla. Cr. 260, 226 P. 2d 989, 995, where Judge Jones, speaking for the court, said:

"It is our conclusion after fully considering this question that the rules determining the admissibility of a confession taken on a phonographic record or on a wire such as in the instant case or a disc are to be determined by the same rules as govern the taking of a confession by shorthand, which is later transcribed. That is, the party offering the wire recording in evidence must make a showing with reference to its preparation, that is, whether the mechanical device was sufficiently capable of taking the confession; and also there should be a proper showing as to the manner of the preservation of the wire recording, that is, as to whether any changes have been made, deletions, or additions to the recording, and of the correctness. The genuineness or the authenticity of the recording must be established. The contention of counsel that the recording should have been rejected because the evidence disclosed that the wire may be erased or otherwise changed likewise applies to a confession which is taken by a court reporter in shorthand and later transcribed. The rules as to the authenticity or genuineness of the confession are the same. If the party objecting to the confession can make a showing that it has been erased or deleted or changed in any manner the court would sustain an objection to its admissibility. The wire recorder which reproduces the actual voice of the accused and those who may be questioning him should be of much more value to the court and the jury than a confession taken in shorthand and later reduced to writing, especially where an issue has been raised as to whether the confession was voluntarily made."

Presumably the sole purpose of the county attorney from the beginning, in having the conversation between himself and J. R. Killion taken down on a wire recorder, was to attempt its use only in case Killion should be called as a witness for the defendant and testify differently. Or perhaps he hoped that Killion would voluntarily testify for the state. The general rule is that where two or more persons are jointly charged with the commission of a crime, and only one of them is put upon trial, statements made by a codefendant after the termination of the conspiracy between the defendant and codefendant, if any existed, are not admissible against the defendant on trial, and where such statements are clearly prejudicial their admission is reversible error. Ramsey v. State, 35 Okla. Cr. 347, 250 P. 936; Wolfe v. State, 38 Okla. Cr. 412, 262 P. 505; Schuh v. State, 44 Okla. Cr. 275, 280 P. 869; Underhill on Criminal Evidence (3rd Ed.) § 719, p. 936.

But where the defendant testified and called his codefendant J. R. Killion to testify, and Killion's testimony was contradictory to the statements made to the county attorney, his statements in behalf of the defendant as the defendant's witness were subject to impeachment. And the further rule is that when two or more persons are jointly charged with the commission of a felony and separately tried, each is a competent witness for or against a codefendant when he voluntarily elects to become such. Morris v. State, 68 Okla. Cr. 147, 96 P. 2d 88. And

see Buxton v. State, 11 Okla. Cr. 85, 143 P. 58, 63, where in the body of the opinion we said:

"* * * when a defendant requests to be a witness, and takes the witness stand in his own behalf, he has voluntarily changed his status from defendant to witness, and he becomes a competent witness for all purposes. It does not matter whether his testimony is for or against himself, or for or against his co-defendant. The only limitation in the statute is that he cannot be compelled to testify either for himself, his codefendant, or for the state, while he is a party in the case."

See, also, Calumet Broadcasting Corp. v. Federal Communications Comm., 82 U. S. App. D. C. 59, 160 F. 2d 285, a civil case, where it was held:

"In hearing before Communications Commission on application for permit to construct and operate a broadcast station, where proper foundation for use to impeach witness was laid, phonographic records of conversations taken without knowledge of participants except one of them * * * were properly admitted in evidence."

It may be asked, however, how can a juror banish from his mind completely, so far as concerns the defendant, statements that are damaging to the accused, and consider the same for the limited purpose of impeaching the witness for defendant? And it may be pointed out that there are many situations in both the civil and criminal law where statements deemed prejudicial to a litigant or an accused are treated as reversible error per se regardless of any attempted curative instruction from the court. This is true. See a provocative article, "Confession of Codefendant" by John A. Phillips, Esq., appearing in the February, 1951, issue of the Oklahoma Law Review, where a long list of illustrative cases is cited.

Usually in these cases, where the prejudicial statements are deemed to constitute reversible error, the statement involved does not form an issue in the case. In the within case the issue was whether the defendant broke and entered the Walker store at Spavinaw. The defendant offered his codefendant to prove that accused did not burglarize said store. But the witness had made contradictory statements, which statements would not have been admissible in evidence on the part of the state as substantive evidence on the point, although the witness could have voluntarily turned state's evidence and testified for the state and repeated these statements which would otherwise have been inadmissible. Morris v. State, supra, and Buxton v. State, supra. Yet, defendant has offered a witness who has surely made false statements on a matter in issue. It may be that he lied to the county attorney and on trial was testifying truly or it might be the other way around. At all events, his evidence is useless and should not be considered for any purpose if impeached. Either the state or the accused would be deprived of a fundamental right if not permitted under the circumstances, as in this case, to impeach such a witness because of the chance that the jury might disregard the instructions of the court and consider the statements made out of court as evidence on the point in issue, rather than for impeachment purposes, and would be a further limitation on trial by jury. Had the prejudicial matters mentioned been deleted, then we would assume that the jury followed the instruction of the court concerning the admission in evidence of the wire-recorded conversation between the county attorney and the witness for the limited purpose admitted, but part of this recording could in no event ever be admitted, and the admission constituted reversible error, as heretofore set out.

Counsel for defendant recalled J. R. Killion in surrebuttal, but there was no denial of the conversation as reproduced by the wire, it being sought merely

to show that the county attorney had made promises to Killion that he would not be prosecuted if he would turn state's evidence.

Defendant counsel stipulated with the county attorney that the case-made contained a full, true, and correct transcript of all the proceedings, and waived notice of his right to suggest amendments, and no contention is made that the transcription in the case-made of the recording played before the jury is not exactly as played, complaint only being made that the reporter did not take down in shorthand the conversation as reproduced from the wire before the jury, at the trial. In the absence of allegations of variance in the conversation as reproduced from the wire before the jury, and as reported, the error in not having the reporter take down the conversation as reproduced on the wire as the same was played will not be considered, as such error was harmless. Tit. 22 O. S. A. § 1068.

It is finally contended that the court erred in refusing counsel's request to instruct the jury on the defense of an alibi, and also to instruct relative to the impeachment of the witness Killion. The record discloses that the request was orally made and not until after the court had read his instructions to the jury, and that no written requested instructions were ever presented. No objections were interposed to the instructions actually given.

As heretofore recited, the evidence discloses that while the store was being burglarized, two or three shots were fired by Doc Reynolds in the direction of the store. The defendant Leeth testified that he heard the shots when fired, but contended that he was down the street at the filling station at the time. Under his own testimony, he was in the town of Spavinaw and in the immediate vicinity of the Walker store from the time he arrived in town until he was getting ready to leave for home in the pickup, and was arrested, which was immediately after the burglary.

We held in the case of Gregg v. State, 69 Okla. Cr. 103, 101 P. 2d 289, 290:

"To entitle the defense of alibi to consideration, the evidence must be such as to show that at the very time of the commission of the crime charged the accused was at another place so far away or under such circumstances that he could not, with ordinary exertion, have reached the place where the crime was committed so as to have participated in the commission thereof; and, in a criminal prosecution, unless the evidence fills this requirement of the law, no instruction on the subject of alibi is necessary to be given by the trial court."

We also said, in the body of the opinion:

"This court will not hold that the trial court should give an instruction upon a so-called 'fifteen minute alibi' where all of the defendant's testimony shows that he was in the immediate vicinity where the alleged offense occurred."

See also Giles v. State, 70 Okla. Cr. 72, 104 P. 2d 975.

The court gave two separate instructions relating to the impeachment of the witness Killion. It is the opinion of this court that this was a sufficient compliance with the oral request of counsel for an instruction on the subject, for no objections, as heretofore stated, were made to the instructions given and no suggested instruction was submitted. In Green v. State, 70 Okla. Cr. 228, 105 P. 2d 795, we said:

"If upon the trial additional instructions are desired, it is the duty of counsel to reduce them to writing and request that they be given, and if he fails to do so a conviction will not be reversed, unless the court is of the opinion, in the light of the entire record and instructions of the court, that there

was a failure to instruct the jury upon some material question of law, and that the defendant has been deprived of a substantial right."

By reason of the prejudicial error pointed out, the case is reversed and the defendant is granted a new trial.

BRETT, P. J., and JONES, J., concur.