OSCN Found Document:REECE v. STATE

 

 
 

 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 REECE v. STATE
2025 OK CR 8
Case Number: D-2021-867
Decided: 07/10/2025
THE COURT OF CRIMINAL APPEALS OF THE STATE OF OKLAHOMA
Cite as: 2025 OK CR 8, __ P.3d __

 

WILLIAM LEWIS REECE, Appellant
v.
THE STATE OF OKLAHOMA, Appellee

OPINION

LEWIS, JUDGE:

¶1 William Lewis Reece, Appellant, was tried by jury on Murder in the First Degree, in violation of 21 O.S.Supp.1997, § 701.7See 21 O.S.1991, § 701.12

FACTS

¶2 William Reece is a serial rapist and killer. This case deals with his crimes against Tiffany Johnson occurring on July 26, 1997. On that day, Reece happened upon Johnson at the Sunshine Carwash in Bethany, Oklahoma. 

¶3 In 2016, Reece confessed to killing Johnson as he was interviewed about his involvement in murdering women in Texas, whose bodies had not been located. According to Reece's statement to law enforcement, he pulled into the car wash with his truck and horse trailer when he noticed an oil leak. While there, he used a sprayer to clean his truck and horse trailer. Johnson was there cleaning her car and had hung her car mats on the wall of the wash bay.

¶4 Reece sprayed Johnson with the sprayer, which according to Reece, caused Johnson to become upset and a confrontation ensued. Reece hit Johnson and drug her into the horse trailer, popped off the straps of her overalls, and undressed her. He put his penis in her vagina for about two minutes, but had trouble maintaining an erection due to the heat. He stopped and started to get up when Johnson hit him in the head with a horseshoe.

¶5 Reece became enraged and started choking Johnson, first with his hands then with a horse bridle. Reece strangled Johnson until she was dead. After killing Johnson, Reece took her body to an area west of Yukon, Oklahoma.

¶6 Further investigation revealed that, during this trip, he stopped in Yukon and made a phone call from a pay phone. A prepaid calling card confirmed that Reece had made the call.

¶7 After making the call, Reece found a desirable location to dump Johnson's body. He left Johnson along Gregory Road just south of Interstate-40 in tall grass. She was completely nude except for a floral bikini top that she wore under the overalls.

¶8 The night after she had been abducted, Bethany police officers discovered Johnson's car at the car wash, with the keys still in it. The floor mats were still hanging on the carwash wall. The next day, Johnson's body was found. Her body bore the signs of strangulation with the use of hands. She had bruises, scratches, and contusions on her hands and wrists. Johnson also had scratches on her shoulders, and bruises to her left arm and left hip.

¶9 The medical examiner testified that she had a bruise to her scalp from blunt force trauma and a fractured hyoid bone which is associated with strangulation. Johnson also had "fine petechiae" on the right-side wall of her vagina caused by trauma. The medical examiner ruled the cause of death as asphyxiation by strangulation and the manner of death was homicide. A rape kit was collected, but due to limited technology at the time, DNA testing was not performed. Johnson's death remained unsolved for many years. It was not until 2016, while serving a prison sentence for an offense he committed against S.S. in May 1997, that Reece confessed to Johnson's murder, as well as other murders committed in Texas.

¶10 Evidence produced at trial began with Reece's earliest attacks against young women. In 1986, in Norman, Oklahoma, Reece kidnapped and forced nineteen-year-old L.E. to perform oral sex on him. Her car had broken down on the side of the road, he stopped and indicated he would render aid. Instead, he lured her into his semi-truck and forced her into the sleeper portion of the cab. She asked Reece why he was doing this, and he said, "because I'm crazy."

¶11 He drove to an air conditioner plant loading dock where he committed sexual attacks on her. She was finally able to get help from someone at the loading dock, after she convinced Reece to let her use the restroom.

¶12 Two months later, in Anadarko, Oklahoma, twenty-year-old A.C. came home from a local club. She was feeling ill, so she went to bed. She woke up in the middle of the night to Reece undressing her. She tried to scream, but Reece put his hand around her throat and the other on her mouth. Reece raped her and forced her to perform oral sex on him. A.C. was able to escape, and later she identified Reece as her attacker.

¶13 Reece was convicted of both crimes and sentenced to prison. He was released in October 1996. A few months after his release, Reece's reign of terror on women began in earnest. In March 1997, twelve-year-old L.S. was jogging near her house in Friendswood, Texas. She never returned home. Seventeen days later, she was found in a pond twenty miles away. She was nude except for the socks she wore, and her neck had been broken.

¶14 In his 2016 confession, Reece said he hit something with his vehicle, and went to see what he hit. He saw L.S. lying in the ditch screaming and crying. To stop her from screaming he put his hand over her mouth, broke her neck, and dumped her body. Evidence of this murder was also introduced during the first stage of trial.

¶15 In May 1997, Reece abducted nineteen-year-old S.S. from a Waffle House parking lot in Webster, Texas, a neighboring city of Friendswood, Texas. Earlier, S.S. was at a convenience store using the payphone. She saw Reece staring at her. Inexplicably, while she was in the convenience store, her tire had gone flat. S.S. did not notice the flat until she drove away. She pulled into the Waffle House parking lot, because of the flat, and Reece pulled in behind her and offered to help.

¶16 Reece asked S.S. to retrieve something from his truck, a white dually pickup. When she got to the truck, Reece came up behind her, pressed a knife to her throat, and ordered her to get in the truck. He drove to a different parking lot where he tore her shirt partially off and began touching her breasts.

¶17 Reece began driving again and said he was taking her to Dallas. On the highway, he ordered S.S. to take off her pants. She slowly slid to the passenger door and opened it. Reece grabbed the back of her shirt, but she fought him off and jumped out while the pickup was traveling at highway speeds.

¶18 Ultimately, S.S. was able to identify Reece, and he was convicted in May 1998 of aggravated kidnapping and sentenced to prison. However, between his attack on S.S. and his arrest and conviction for her kidnapping, Reece attacked five more women including Tiffany Johnson.

¶19 On July 3, 1997, he kidnapped sixteen-year-old E.D. and seventeen-year-old C.B. after offering them a ride home from a cafe' in Pearland, Texas, a suburb south of Houston (and bordering Friendswood). They accepted the ride because they recognized Reece as a regular patron of the cafe´. Instead of taking them home, Reece took them to his apartment where he forcibly raped both girls. E.D. asked why he was doing this, and he said it was because he was crazy. They eventually pleaded for him to take them home and promised not to tell. Reece consented and took them home. He told C.B. he wanted to come back for her and take her to Oklahoma.

¶20 C.B. and E.D. were embarrassed and ashamed, so they made a pact not to tell anyone what had occurred. They told no-one until they saw Reece on the news in connection to the S.S. kidnapping in October 1997.

¶21 On July 15, 1997, Reece kidnapped and killed K.C. She was last seen in Denton, Texas where she locked her keys in her car at the police station. She walked across the street to use the phone to call her boyfriend for a ride. She was never seen alive again. Her disappearance remained unsolved until Reece confessed to the murder in his 2016 interviews.

¶22 He said that K.C. ran into him at the convenience store, spilled her drink on him, and insulted him. He slammed K.C. against his truck, slapped her, and strangled her. He believed her neck was broken. He buried her naked body in a rice field in Brazoria County, Texas

¶23 After killing Tiffany Johnson, on August 17, 1997, Reece encountered seventeen-year-old J.C. in Clear Lake, Texas

¶24 Reece had been a suspect in these numerous murders, and as early as 2013 Reece voluntarily agreed to give a DNA sample. Reece's DNA was finally tested against the rape kit collected from Tiffany Johnson when technology allowed for more definitive testing. Traditional DNA testing showed that Reece could not be excluded as the contributor for the partial male profile developed from the sample taken from the victim. The probability of selecting an unrelated individual at random from the population with the same partial DNA profile was at least 1 in 11,200. Y-STR DNA testing showed that Reece was also a potential source for the DNA collected from Tiffany Johnson with a probability of Reece's Y-STR DNA profile appearing in 54 of 29,182 individuals according to a 2021 published database. 

¶25 Other evidence tied Reece to the murder of Tiffany Johnson. The owner of the car wash where Reece attacked Johnson testified that he recognized Reece in a Houston news report in November/December 1997 or January 1998. He had seen Reece at the car wash eight to ten times over a couple of months in 1997. He was standoffish and was driving a large white Ford dually pickup with a half-type of camper shell, extending from the cab about three feet. He contacted the Oklahoma State Bureau of Investigation at the time and reported what he had observed.

¶26 After hearing the evidence presented during a two-stage trial, the jury convicted Reece of first-degree murder and sentenced him to death. He now appeals the Judgment and Sentence raising numerous issues. We address Reece's propositions on appeal as they arose during trial, beginning with jury selection.

JURY SELECTION

¶27 Reece argues, in Proposition Nine, that the trial court erred in refusing to remove three prospective jurors for cause, depriving him of his right to a fair and impartial jury under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution as well as corresponding provisions of the Oklahoma Constitution. A defendant is entitled by the Federal and Oklahoma Constitutions, as well as Oklahoma Statutes, to a fair trial by a panel of impartial jurors. See Article 2, Section 20 of the Oklahoma Constitution and 22 O.S.2021, § 561see also DeRosa v. State, 2004 OK CR 1989 P.3d 1124Irvin v. Dowd, 366 U.S. 717, 722 (1961)).

¶28 Reece preserved this issue for review by using his peremptory challenges to strike the three panelists he had unsuccessfully challenged for cause; by requesting, without success, additional peremptory challenges; and by making a record of three other "unacceptable" prospective jurors he would have excused with peremptory challenges had he not been forced to use his challenges on the panelists the district court refused to excuse for cause. See Posey v. State, 2024 OK CR 10548 P.3d 1245 see also Browning v. State, 2006 OK CR 8134 P.3d 816Nolen v. State, 2021 OK CR 5485 P.3d 829Littlejohn v. State, 2004 OK CR 685 P.3d 287

¶29 The proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment is "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 424 (1985) (internal quotations omitted). See also Tryon v. State, 2018 OK CR 20423 P.3d 617Eizember v. State, 2007 OK CR 29164 P.3d 208

¶30 Under Witt, jurors in a capital case must be willing to consider each of the three statutory punishments: the death penalty, life imprisonment without the possibility of parole, and life imprisonment with the possibility of parole. Nolen, 2021 OK CR 5Tryon, 2018 OK CR 20Johnson v. State, 2012 OK CR 5272 P.3d 720Sanchez v. State, 2009 OK CR 31223 P.3d 980

¶31 The State argues that the Nolen standard, where doubts regarding juror impartiality are resolved in favor of the accused is in conflict with our holding in Tryon, where we held that, when there is ambiguity in the prospective juror's statements, the trial court's decision, aided as it is by assessment of the potential juror's demeanor, is entitled to deference. Tryon, 2018 OK CR 20

¶32 In this Court's early cases, we held that it was the trial courts duty to resolve doubts about a potential juror's impartiality in favor of the accused. See Scrivener v State, 1938 OK CR 975 P.2d 1154Temple v State, 1918 OK CR 152175 P. 733Nolen, this court made it clear that,

this Court looks to the entirety of each potential juror's voir dire and gives deference to the ruling of the trial court because, "the trial judge is in a position to personally observe the panelists, and take into account a number of non-verbal factors that cannot be observed from a transcript." Johnson, 2012 OK CR 5Harmon v. State, 2011 OK CR 6248 P.3d 918See also Uttecht v. Brown, 551 U.S. 1, 9 (2007) ("Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors."); Eizember v. Trammell, 803 F.3d 1129, 1135 (10th Cir. 2015) ("the trial judge is best positioned to determine whether a potential juror will be able to follow his or her instructions-and that a court of appeals removed from the live proceedings must afford significant deference to the trial judge's assessments").

 

Nolen, 2021 OK CR 5Perez v. State, 2023 OK CR 1525 P.3d 46 Neloms v. State, 2012 OK CR 7274 P.3d 161

¶33 Reece's proposition concerns his complaint that prospective jurors N.P., R.S., and R.G. should have been excused for cause by the trial court. He exhausted his nine peremptory challenges, using three on these prospective jurors, and he claims that he was required to keep three undesirable jurors, because he had exhausted his peremptory challenges, and the trial court denied his request for additional peremptory challenges. 

¶34 Potential juror N.P., at one point stated, "if someone's guilty . . . it was, like, murder -- premeditated murder, planned out murder, it's pretty cut and dry it's the death penalty. But later in the same answer N.P. said, "And, I mean, you know, none of us wants to kill somebody. You don't want to put somebody to the death penalty." Throughout the voir dire of N.P., he confirmed at least twenty-three times that he would consider all three punishment options and/or would not automatically vote for the death penalty. N.P. stated that he would look at all the evidence and consider all sides. N.P. subsequently did say that he would not consider a life sentence and probably not a life without parole for a case of premeditated murder, but when pressed on the issue, he stated he would not automatically vote for the death penalty, and he would consider all three and decide depending on the evidence. N.P. said he would be unbiased in his decision, and he would base his decision on the evidence. He would look at all sides before deciding. N.P. stated many times that he would not want to send someone to death row, he would consider all three options, and he would want to hear all the evidence before deciding the punishment.

¶35 Appellant has not shown that the trial court abused its discretion in failing to remove N.P. for cause. N.P.'s answers fell within the guidelines of Nolen as N.P. agreed to consider all three punishments. Any inconsistencies in the voir dire of N.P. were properly resolved by the trial court; thus, there was no abuse of discretion.

¶36 Potential juror R.S. said she would automatically vote for the death sentence if someone murdered one of her children. She did, however, promise to take her family out of the equation. R.S. admitted that she was focused on getting justice. She explained that she was meaning justice for the victim and everyone involved. She also said that getting justice might mean lowering the burden of proof. R.S. left the individual voir dire room and counsel asked to remove her for cause. The State argued that she was probably confused about the burden of proof, because, at that point no one had explained burden of proof or any of the evidence weighing procedures. At no time did R.S. indicate that death was the only just punishment, and she told the trial court that she would not automatically vote for the death penalty. Reece failed to show that R.S. would not consider all three punishment options.

¶37 The trial court did not abuse its discretion in failing to remove R.S. for cause. At the time, R.S. had not been informed of the burdens of proof and the sentencing process. R.S.'s responses, in that respect, are of little value. See Eizember, 2007 OK CR 29

¶38 Potential juror R.G. initially stated that a life sentence is wrong because the victim is dead. After the sentencing process was explained to her, R.G. committed to considering all three punishment options. R.G. did say that she did not believe that life imprisonment was severe enough and believed the death penalty should be given for the murder of a child. Because this case did not involve a child, the trial court cut off defense counsel's questioning concerning this hypothetical situation. Moreover, after R.G. learned there were three punishment options, she affirmed that she would consider all the punishment options. 

¶39 R.G. came into the courtroom as a strong supporter of the death penalty, but after the process was explained, her support diminished. She understood there were three punishment options, and agreed to meaningfully consider all three options. We find that the trial court did not abuse its discretion in failing to remove R.G. for cause.

¶40 We further find that the trial court is to be commended on the process of individual voir dire and for carefully considering each potential juror's demeanor during the voir dire process. The trial court did not abuse its discretion in the jury selection process. We hold, therefore, that Proposition Nine must be denied.

FIRST STAGE EVIDENTIARY ISSUES

¶41 In his first two propositions, Reece claims that his confessions were not knowingly and voluntarily given, and his out-of-court statements were improperly admitted into evidence violating his right against self-incrimination.

I.

¶42 In Proposition One, Reece claims that his confessions to murdering Tiffany Johnson, L.S., K.C., and J.C. were coerced and induced. Reece preserved this error with contemporaneous objections; thus, we review the trial court's decision to allow the confessions into evidence for an abuse of discretion; the decision will not be disturbed absent an abuse of that discretion. Hammick v. State, 2019 OK CR 21449 P.3d 1272de novo, and factual findings for clear error, in the light most favorable to the State. Id.

¶43 An abuse of discretion is an unreasonable, unconscionable, and arbitrary action taken without proper consideration of the facts and law pertaining to the matter submitted. Cuesta-Rodriguez v. State, 2010 OK CR 23241 P.3d 214State v. Busby, 2022 OK CR 4505 P.3d 932 State v. Haliburton, 2018 OK CR 28429 P.3d 997Busby, 2022 OK CR 4

¶44 The trial court conducted a pre-trial Jackson v. Denno

¶45 Later when the State sought to introduce the statements, Reece made his contemporaneous objection, thus preserving the issue for review. 12 O.S.2011, § 2104See Hancock v. State, 2007 OK CR 9155 P.3d 796overruled on other grounds by Williamson v. State, 2018 OK CR 15422 P.3d 752see also Dodd v. State, 2004 OK CR 31100 P.3d 1017

¶46 Initially, Reece cites to his low-level intelligence quotient (75 at 12 years of age, and 78 prior to trial) and his borderline intellectual disability to show that he was easily induced by Ranger Holland to believe he would not get the death penalty if he cooperated. Reece claims that Holland convinced him that, although he did not make the death penalty decisions, he had the power to influence the decision makers. Reece cites to a plethora of conversations between Holland and Reece to show that Reece was coerced and induced into confessing. He uses Holland's statements to show that Holland indicated that he had the authority and the power to get deals done.

¶47 On appeal, Reece bears the burden to show that the trial court abused its discretion in ruling that his statements were admissible under the facts and circumstances of this case. We find that he has not met his burden.

¶48 In admitting the statements, the trial court reasoned that Holland did not promise that Reece would not receive the death penalty if he confessed, but that Holland promised that he would do everything in his power to convince the prosecutors not to seek the death penalty. The trial court also found that Holland repeatedly told Reece that the decision was not up to him, but that he would intervene on his behalf if he cooperated. We review the trial court's determination in the following manner.

¶49 This Court is tasked with determining whether the trial court's view of the facts was clearly erroneous. We look to the totality of the circumstances to determine whether Reece's confession was the product of an essentially free and unconstrained choice by him. See Gilbert v. State, 1997 OK CR 71951 P.2d 98 Crawford v. State, 1992 OK CR 62840 P.2d 627see also Schneckloth v. Bustamonte, 412 U. S. 218, 225-26 (1973). The confession "must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." Malloy v. Hogan, 378 U.S. 1, 7 (1964) (quoting Bram v. United States, 168 U.S. 532, 542-43 (1897)).

¶50 In Bench v. State, 2018 OK CR 31431 P.3d 929Culombe v. Connecticut, 367 U.S. 568, 602 (1961), stating that the test for the admissibility of an inculpatory statement comes down to answering one simple question:

Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.

¶51 "Whether a suspect's statements to police are voluntary in the legal sense depends on an evaluation of all the surrounding circumstances, including the characteristics of the accused and the details of the interrogation." Underwood, 2011 OK CR 12Schneckloth, 412 U.S. at 226).

¶52 The facts support the trial court's findings. During the initial, February 9, 2016, interview between Holland and Reece, Holland urged Reece to aid in locating the bodies of the victims, J.C. and K.C., so he could help control his own destiny. Holland told Reece that he thought Oklahoma would agree to forego seeking the death penalty if the defendant led him to the bodies of J.C. and K.C., but that the choice was not up to him. Holland told Reece that the choice was up to the respective District Attorneys. Throughout the interview, Holland expressly told Reece that he could not promise him anything. At one point, however, Holland indicated that Oklahoma promised to give the death penalty if he didn't cooperate. Holland repeatedly tells Reece that he is not the D.A., not the Judge, not the Governor, and not the decision maker. He clearly tells him that he is not the decision maker. He also tells Reece that he needs to help and give them a reason not to file for the death penalty. At the conclusion of this interview, Holland agreed to let Reece think over the weekend. At that point, Reece arranged photographs of four victims that he was willing to talk about the following week.

¶53 That following week, on February 15, 2016, Holland returned to talk to Reece. Reece presented a list of demands, and Holland reminded him that he did not have the power to grant his requests. Reece informed Holland that he could not get the death penalty because he was a special education student. Again, Holland told Reece that he believed that Oklahoma would agree not to seek a death sentence, but he was not the District Attorney and could not speak for him. Holland repeatedly informs Reece that he is not the decision maker, but shared a belief that he would not get the death penalty. Two counties in Texas had already agreed not to seek the death penalty under certain circumstances, but Holland told Reece that there were no agreements with Oklahoma and another Texas county.

¶54 Reece knew Oklahoma had not agreed to any terms. Nevertheless, Reece agreed to lead authorities to one of the bodies that day. Reece directed Holland to a site (Site 1) where he claimed to have buried K.C. On the way, Reece admitted to killing K.C. and described disposing of the body.

¶55 The next day, Holland picked up Reece and they drove to Site 1. They were accompanied by Detective Doug Bacon of the Friendswood police department. Bacon recorded Reece's conversations during the successive trips to Site 1. Holland testified that Reece seemed more than willing to talk about the murders. Holland reminded him daily that Oklahoma had not decided about the death penalty.

¶56 On February 18, Reece gave details about the murders of K.C. and J.C. to Holland and Detective Eric Beckwith of the Denton Police Department. Reece insisted they find K.C.'s body first instead of trying to find J.C. first. He replied that "if they don't want to deal, . . . let them give me the needle." He also stated that he was willing to take the death penalty and would show authorities where J.C. was, but they had to find K.C. first.

¶57 On February 19, Reece gave information about the murders of L.S., J.C., and K.C. He was frustrated that they had not found K.C.'s body. Reece seemed more interested in showing that he was being truthful, so his frustration was evident.

¶58 On February 23, Reece wanted to take Holland to the location of J.C.'s body. Reece made Holland promise that they would continue to search for K.C.'s body. Finally, on the 26th, at Reece's request, Detective Bacon formally questioned Reece, reading the Miranda warning to Reece for the first time. Reece wanted to get things off his chest. After the Miranda warning, Reece gave incriminating statements regarding the murders of L.S., J.C., and K.C. Then on February 27, Detective Bacon interviewed Reece specifically about Tiffany Johnson. Immediately, Reece began to provide his version of the events as set forth in the above facts.

¶59 On March 1, 2016, Reece discussed his life and the murders. Reece stated that he was speaking freely because he wanted to clear his conscience and help the families. J.C.'s remains were found on March 18, and K.C.'s remains were found on April 1, 2016.

¶60 On June 21, 2016, Holland arrived at the jail at Reece's request. Holland told Reece that he was under arrest and read the Miranda warning to Reece. Reece had not been taken to excavation sites, at his attorney's request, after J.C.'s remains were found. Reece, however, wanted to get things off his chest, and he wanted to give families closure. Reece spoke with his attorney, Anthony Osso, who advised him not to talk, but Reece ignored the advice and provided information about the murder of L.S. He stated that he was talking of his own free will. Days later, Holland, Osso, and others met with the Oklahoma County District Attorney asking that he not seek the death penalty. The District Attorney did not answer their request at that time, and, in fact, days later Reece was informed that Oklahoma was going to seek the death penalty.

¶61 The trial court heard all of this evidence and determined that the statements were freely and voluntarily given, especially in light of his February 15th demands knowing that there was no agreement between the parties about foregoing the death penalty. We find that the trial court's decision did not amount to an abuse of discretion and the statements were admissible. Proposition One is denied.

II.

¶62 In Proposition Two, Reece claims that his out-of-court statements were improperly admitted because Miranda warnings were not given until he had given incriminating statements. Reece argues that, because Miranda warnings were not given, the introduction of the statements was in error, regardless of the voluntariness of the statements. See Miranda, 384 U.S. at 444. Further, he argues, the Miranda warnings given by Bacon on February 26 were not sufficient to allow admission of subsequent incriminating statements. See Missouri v. Seibert, 542 U.S. 600 (2004).

¶63 Reece argues that Seibert requires suppression of the statements, because Seibert holds that Miranda warnings given in the middle of an interrogation are improper. Id., 542 U.S. at 604. The Court, in Seibert, reasoned that if the police withhold proper Miranda warnings until they obtain a confession, the warnings are ineffective for successive interrogation. Id. at 613. Thus, Reece attacks both the pre-Miranda statements because he was not given the warnings, and the post-Miranda statements because they were tainted and violate Seibert. 

¶64 Reece made the proper contemporaneous objections at trial; thus, we review the trial court's decision for an abuse of discretion as outlined in our review of Proposition One.

¶65 The inquiry requires a determination of whether Miranda warnings were required at the outset. Two questions must be answered, first, whether Reece was in custody and, second, whether Reece was interrogated by police while in custody. Miranda, 384 U.S. at 444, 467-69.

¶66 The relevant law on interrogations is clear. "[T]he initial step is to ascertain whether, in light of the objective circumstances of the interrogation, . . . a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." Howes v. Fields, 565 U.S. 499, 509 (2012) [internal quotations and citations omitted.]

¶67 "Custody" specifies circumstances that are thought to present a danger of coercion. Id. at 508-09. Courts must examine all the circumstances. Id. at 509. Relevant factors include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the disposition of the interviewee at the end of the questioning. Id. 

¶68 Not all restraints amount to custody. Id. The freedom of movement factor is not the ultimate factor. Id. The question is whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda. Id.

¶69 The defendant in Howes, much like Appellant, was serving a prison sentence on separate charges when he was questioned without Miranda warnings in a conference room. The defendant was informed that he could leave whenever he wanted, and he never asked to be returned to his cell. The interview was several hours long, lasting into the night. The Supreme Court reasoned that "service of a term of imprisonment, without more, is not enough to constitute Miranda custody." Id. at 512.

¶70 Reece's interviews of February 9th and 16th were conducted in the prison where he was serving a sentence for kidnapping. The February 18th and 19th conversations were held at Site 1 and at the Friendswood jail.

¶71 The prison interviews were held in a conference room with the door slightly ajar. The interviews occurred during the day. Reece was repeatedly told that he was free to leave, and he was offered breaks, food, and drinks. Reece was not restrained and there is no evidence that Ranger Holland was armed.

¶72 The questioning at Site 1 began with Reece volunteering information about the murders. He was eager to talk about the crime and initiated the conversation. Similarly, at the Friendswood jail, Reece was free to stop the conversations at any time and was free to leave the interrogation room.

¶73 The measures adopted in Miranda were adopted to protect against the coercive nature of custodial interrogation; therefore, "they are required 'only where there has been such a restriction on a person's freedom as to render him in custody.'" See J.D.B. v. North Carolina, 564 U.S. 261, 270 (2011) (quoting Stansbury v. California, 511 U.S. 318, 322 (1994) and Oregon v. Mathiason, 429 U.S.492, 495 (1977)). There are two inquiries necessary to determine whether a person is in custody for Miranda purposes; one, the circumstances surrounding the questioning and, two, given the circumstances, would a reasonable person have felt at liberty to terminate the interrogation and leave. Id. "[T]he court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." Id. (quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995)). The "subjective views harbored by either the interrogating officers or the person being questioned" are irrelevant. J.D.B., 564 U.S. at 271 (quoting Stansbury, 511 U.S. at 323). Moreover, warnings are not required "simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." Mathiason, 429 U.S. at 495 (1977).

¶74 The State also argues that even if Reece was in custody, the facts of Seibert are distinguishable. In Seibert the Court decried the "two-step questioning technique" where the police elicit a confession during an unwarned custodial interrogation, then immediately provide Miranda warnings and question the defendant further in the apparent hope that the suspect, having already confessed, would be more likely to just keep talking. See Seibert, 542 U.S. at 613, ("Upon hearing [Miranda] warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again" (emphasis added)). See also Seibert, 542 U.S. at 604-05, 609-14; and Seibert, 542 U.S. at 618 (Kennedy, J., concurring in the judgment). See also United States v. Guillen, 995 F.3d 1095, 1114 (10th Cir. 2021) (Stating, "Justice Kennedy's concurrence is the binding opinion from Seibert.").

¶75 The State bears the burden, at trial, of showing officers did not circumvent Miranda. The officers did not believe that Reece was in custody for the crimes they were investigating and did not believe Miranda was required. Reece was free to leave and discontinue questioning at any time. There was no intent on the part of the officers to solicit a full confession and lead Reece back through the confession again once warnings were given. See Guillen, 995 F.3d at 1123.

¶76 This Court finds that under the totality of the circumstances, the trial court did not abuse its discretion in finding that Reece was not in custody for purposes of Miranda at the outset and that the "mid-stream" warnings were proper and there were no violations against self-incrimination rights. Proposition Two is denied. 

III.

¶77 Reece argues, in Proposition Three, that his rights to due process were violated when Detective Bacon failed to preserve forty to sixty hours of recorded conversations between him and Bacon. Reece claims that material evidence favorable to him was eliminated, thus violating his rights under Brady v. Maryland, 373 U.S. 83 (1963). Contemporaneous objections preserved this issue for review.

¶78 Reece claims we should review this issue under the analysis found in California v. Trombetta, 467 U.S. 479 (1984), which requires him to establish that the evidence 1) possessed apparent exculpatory value prior to being lost, and 2) be of such a nature that the accused is unable to obtain comparable evidence by other reasonably available means. Id. at 489.

¶79 Reece, however, cannot show that the erased conversations possess any apparent exculpatory value. Moreover, Reece is able to obtain comparable evidence by other means. Reece, himself, could have testified about the contents of the recordings during the suppression hearings. See United States v. Parker, 72 F.3d 1444, 1452 (10th Cir. 1995) (finding that if the defendants had a different version of the events than that related by the officer who failed to preserve the video recording, the defendants could have taken the stand and testified at the suppression hearing). 

¶80 Alternatively, Reece urges this court to consider the bad faith analysis in Arizona v. Youngblood, 488 U.S. 51, 58 (1988) which holds that if the exculpatory nature of the destroyed material is uncertain and only potentially useful, failure to preserve the evidence constitutes a due process violation only if the State has acted in bad faith.

¶81 The trial court found that there were "innocent explanations for deletion of the hours and hours of conversations that they have." The trial court ruled that there was no bad faith in the destruction of the recordings.

¶82 Detective Bacon testified that he was recording all of the time that he spent with Reece. He tried to listen to every recording after it was made that day. Within a week the recorder was out of space, and he could not listen to all of the recordings, so he deleted approximately 50-60 hours of irrelevant material. The deleted recordings included hours of dead air (silence), and conversations about Reece's family life and life in prison. Bacon listened to all of the deleted recordings before deleting them. He testified that there was nothing in the recordings that had anything to do with the case. Bacon testified that he did not delete any conversations that were even remotely connected to the crimes. Bacon stated that during the time of these deleted recordings, Reece never talked about victim Johnson.

¶83 Reece claims that withholding the recordings from him, regardless of whether the recordings were destroyed in good faith or bad faith, violated Brady. He argues that the absence of the tapes deprived him his right to a fair trial by undermining his ability to impeach Detective Bacon, undermining his ability to present a defense, limiting his ability to confront witnesses against him, and limiting his mitigation evidence.

¶84 Reece is asking this Court to place itself in a speculative position and grant relief based upon a possibility that there would be exculpatory evidence. The burden is on Reece "to show that, without considering the intent of the prosecution, the evidence was: 1) suppressed by the prosecution, 2) favorable to the accused, and 3) material as to guilt or punishment." Brown v. State, 2018 OK CR 3422 P.3d 155Brady, 373 U.S. at 87). The duty to disclose evidence favorable to an accused includes impeachment as well as exculpatory evidence. United States v. Bagley, 473 U.S. 667, 676 (1985). Brady evidence encompasses not only purely exculpatory evidence, but also evidence which could be used for impeachment. Id. "To establish a Brady violation, a defendant must show that the prosecution failed to disclose evidence that was favorable to him or exculpatory, and that the evidence was material." Brown, 2018 OK CR 3Id. 2018 OK CR 3Id.

¶85 The Supreme Court of the United States held that, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law". Youngblood, 488 U.S. at 58; see also Hogan v. State, 1994 OK CR 41877 P.2d 1157

¶86 Here, the State did not deny Reece due process of law. He has not shown that the information on the deleted tapes was exculpatory, nor that it would it have led to the discovery exculpatory information. He cannot show that the tapes were erased in bad faith, thus the failure to preserve potentially useful evidence in the tapes does not constitute a denial of due process of law. Proposition Three is denied.

IV.

¶87 In Proposition Four, Reece claims he was denied effective assistance of counsel when counsel failed to fully cross-examine Detective Bacon regarding the destroyed recordings. Any insufficiency in the cross-examination to show that the destruction was done in bad faith was due to ineffective assistance of counsel, Reece claims.

¶88 Counsel failed to actually ask if it was standard procedure for the Friendswood Police Department to destroy evidence. This question was necessary, Reece claims, to consider whether the government can offer an innocent explanation for its failure to preserve the materials. See United States v. Bohl, 25 F.3d 904, 912-13 (stating that the State does not necessarily engage in bad faith conduct when the destruction of evidence results from a standard procedure).

¶89 Reece has contemporaneously filed a Motion to Supplement the Record with extra record evidence and a Motion for Evidentiary Hearing pursuant to Rule 3.11 (A) and (B), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2024). The Affidavit attached to the motion is an Affidavit from Reece stating that he was coached in his confession by Detective Bacon during the now deleted interviews. Counsel urges this court to supplement the record without hearing and cites an unpublished case to show there is precedent for this procedure. 

¶90 This Court reviews ineffective assistance claims to determine whether counsel's performance was unreasonably deficient under prevailing professional norms; and, if so, whether that performance deprived Appellant of a fair trial with a reliable result. Strickland v. Washington, 466 U.S. 668, 687 (1984).

¶91 To prove that trial counsel was ineffective, an appellant must show that counsel's conduct was "outside the wide range of professionally competent assistance." Id. at 690. An appellant must also show that he was prejudiced by showing that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." Id. at 694.

¶92 In Strickland, the Court went on to say that there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional conduct, i.e., an appellant must overcome the presumption that, under the circumstances, counsel's conduct constituted sound trial strategy. Id. at 689.

¶93 It is unlikely that there was any police department policy regarding the erasure of these tapes. Bacon was under no obligation to record the conversations, nor is there a constitutional duty of the police to record interviews. There was no denial of Reece's rights in the destruction of the tapes, and he cannot show that counsel was ineffective for failing to develop his claims at trial. Proposition Four is denied.

V.

¶94 Reece complains, in Proposition Five, that the trial court committed error in allowing sexual propensity evidence pursuant to 12 O.S.2011, § 2413

¶95 Reece objected to the introduction of the evidence on these grounds at the time admission was sought. The trial court overruled his objection; thus, we review the trial court's decision for an abuse of discretion. Horn v. State, 2009 OK CR 7204 P.3d 777see also Williams v. State, 2021 OK CR 19496 P.3d 621

¶96 Before analyzing this proposition as a propensity evidence issue, we note that this evidence, arguably, would have been admissible during the first stage of trial under § 2404 (B) as evidence of other crimes, and it would have, most certainly, been admissible in the second stage of trial to support aggravating circumstances. Therefore, the only real issue is whether the jury's use of this evidence was properly channeled by the trial court's jury instructions.

¶97 As propensity evidence, the admission is governed by State statute. Title 12 O.S.2011, § 2413

A. In a criminal case in which the defendant is accused of an offense of sexual assault, evidence of the defendant's commission of another offense or offenses of sexual assault is admissible, and may be considered for its bearing on any matter to which it is relevant.

B. In a case in which the state intends to offer evidence under this rule, the attorney for the state shall disclose the evidence to the defendant, including statements of witnesses or a summary of the substance of any testimony that is expected to be offered, at least fifteen (15) days before the scheduled date of trial or at such later time as the court may allow for good cause.

C. This rule shall not be construed to limit the admission or consideration of evidence under any other rule.

D. For purposes of this rule, "offense of sexual assault" means a crime under federal law or the laws of this state that involve:

1. Any conduct proscribed by Sections 1111 through 1125 of Title 21 of the Oklahoma Statutes;

2. Contact, without consent, between any part of the defendant's body or an object and the genitals or anus of another person;

3. Contact, without consent, between the genitals or anus of the defendant and any part of another person's body;

4. Deriving sexual pleasure or gratification from the infliction of death, bodily injury, emotional distress, or physical pain on another person; or

5. An attempt or conspiracy to engage in conduct described in paragraphs 1 through 4 of this subsection.

¶98 In admitting propensity evidence pursuant to § 2413 and § 2414:

trial courts should consider, but not be limited to the following factors: 1) how clearly the prior act has been proved; 2) how probative the evidence is of the material fact it is admitted to prove; 3) how seriously disputed the material fact is; and 4) whether the government can avail itself of any less prejudicial evidence. When analyzing the dangers that admission of propensity evidence poses, the trial court should consider: 1) how likely is it such evidence will contribute to an improperly based jury verdict; and 2) the extent to which such evidence will distract the jury from the central issues of the trial.

Horn, 2009 OK CR 7

¶99 Reece's proposition centers on testimony from L.F., S.S., C.B., E.D., and A.C., which is set forth in the facts above. Reece claims that the improper introduction of the evidence rises to the level of Constitutional error, which if error, cannot be harmless unless the State can show, beyond a reasonable doubt, that the error did not contribute to the jury's verdict. See LaFevers v. State, 1995 OK CR 26897 P.2d 292

¶100 The trial court ruled in a pretrial hearing that the evidence would be admissible finding that the State met its burden under 12 O.S.2011, § 2413

¶101 The trial court relied on the language of the statute, which makes it clear that an "offense of sexual assault" is not limited to unlawful sexual contact or conduct. An offense of sexual assault includes "[d]eriving sexual pleasure or gratification from the infliction of death, bodily injury, emotional distress, or physical pain on another person . . ." 12 O.S.2011, § 2413

¶102 The trial court further instructed the jury, at the end of the guilt/innocence stage of trial, that:

You have heard evidence that the defendant may have committed other offenses of sexual assault in addition to the offense charged in the Information. You may consider this evidence for its tendency, if any, to show the defendant's predisposition or inclination to engage in acts of sexual assault.

This evidence of predisposition or inclination to engage in acts of sexual assault is to be considered by you along with all of the other evidence and given the weight, if any, you deem appropriate in reaching your verdict.

You may not, however, convict the defendant solely because you believe he committed these other offenses or solely because you believe he is predisposed or inclined to engage in acts of sexual assault. The prosecution's burden of proof to establish the defendant's guilt beyond a reasonable doubt remains as to each and every element of the offense charged.

¶103 Reece, however, urges this Court to read § 2413 narrowly so that only those charged with sexual offense crimes, or those charged with crimes for which sexual pleasure or gratification is an element, may be faced with the introduction of sexual propensity evidence. He cites People v. Walker, 43 Cal. Rptr. 3d 257, 139 Cal. App. 4th 782 (Ct. App. 2006). Walker, the court was presented with the question of whether,

the definition of sexual offense of crimes that involve "deriving sexual pleasure or gratification from the infliction of death, bodily injury, or physical pain on another person" authorizes use of evidence of other sexual offenses when the circumstances under which a violent crime has been committed suggests the defendant derived sexual pleasure or gratification from the victim's pain, even though sexual pleasure or gratification is neither a necessary element of the charged offense nor alleged in the information as an enhancement or aggravating factor.

¶104 The California court held that a person must be charged with an offense which contains an adjudicative element of "sexual assault" in order for "sexual assault" propensity evidence to be admissible. Walker, 43 Cal. Rptr. 3d at 272. The court reasoned that because the crime for which the defendant was charged did not involve, as one of its necessary adjudicated elements, deriving sexual pleasure or gratification from inflicting death, bodily injury or physical pain on his victim, the trial court erred in allowing introduction of three prior sexual attacks on women. Id. The court construed the statute to limit its application to crimes in which deriving sexual pleasure or gratification through inflicting physical pain is an element or component of the charge and not simply a circumstance of the crime's commission. Id. at 270.

¶105 The court reasoned that the legislative history indicated an intent to limit propensity evidence to a specific subset of crimes -- traditional sexual offenses where the outcome of the prosecution frequently rests on the relative credibility of the victim and defendant. Id. at 272. The Court held that murder was not one of the sexual offenses enumerated, nor did it, as charged in their case, involve as one if its necessary adjudicated elements deriving sexual pleasure or gratification from inflicting death, bodily injury, or physical pain on the victim; therefore, introduction of the prior sexual assaults as propensity evidence was in error. Id. at 272.

¶106 Even broadly interpreted, the court, in Walker, reasoned that there was no evidence that Walker's sexual contact with the victim was nonconsensual and there was no evidence that the murder was motivated by Walker's desire for sexual gratification.

¶107 The California court did, however, find that evidence of two of the three prior sexual assaults admissible as other crimes evidence to show identity, motive, and intent. Id. at 272. Although the trial court erred in admitting evidence of the third attack, the introduction was harmless considering the evidence of guilt. Id. at 277. The court also went on to hold that the giving of propensity instructions was harmless under the facts of the case, even under a Chapman standard. Id. at 279.

¶108 The Walker case is not binding on this Court, and we decline Reece's invitation to adopt the California court's interpretation of the sexual propensity evidence statute. While the State cites no cases which are directly on point, we find that the plain language of the statute supports a holding, in this case, that sexual propensity evidence is admissible in a malice murder case where the evidence points to a sexual component or motive of the murder, or where an uncharged sex crime is inextricably intertwined with the murder so as to be res gestae of the homicide offense. 

¶109 The State's theory was that Reece killed the victim after raping her and his motivation in the killing was to derive sexual pleasure or gratification. Thus, evidence of the prior sexual assault crimes was admissible propensity evidence.

¶110 Reece's defense, according to his confession, was that the rape and murder were separate, and he killed the victim because she attacked him after the sexual assault. He killed in reaction to her aggression. The propensity evidence, however, was relevant to show that he killed her, as he killed others, in an effort to derive sexual pleasure or gratification. It is simply his nature.

¶111 Moreover, had the State charged Reece with raping the victim, as probable cause exists that he did, the prior crimes evidence would have been admissible under the propensity exception. The State's decision to focus on the first-degree murder charge should not deprive them of the propensity evidence in this murder motivated by sexual pleasure case. It is possible that the State may have been barred from charging Reece with rape due to statute of limitations problems, this too should not deprive the State of the evidence they needed to prove their case. We find, therefore, the sexual propensity evidence was admissible in this first-degree murder trial under the facts of this case.

¶112 Finally, Reece also argues that his due process rights were violated, because the trial court did not undertake the proper weighing of the probative value of the sexual propensity evidence against the dangers found in 12 O.S.2011, § 2403See Horn, 2009 OK CR 7See Bush v. State, 2012 OK CR 9280 P.3d 337Akins v. State, 1974 OK CR 116523 P.2d 1111substantially outweighed by an unfairly prejudicial effect." James v. State, 2009 OK CR 8204 P.3d 79312 O.S.2011, § 2403James, the particular circumstances of the prior crimes showed a visible connection to the present case. Reece's crimes involved the sexual assault of young women. He lured them into his vehicle by trick or force prior to the sexual assault, and the victims who went along and placated him were allowed to survive; those that fought back were killed.

¶113 Regardless of any argument that the evidence of sexual assault was uncontested, the State must, in their case in chief, anticipate possible defenses to a certain degree. See Cole v. State, 2007 OK CR 27164 P.3d 1089

VI.

¶114 In Proposition Six, Reece claims that the above evidence was not properly admitted as other crimes evidence pursuant to 12 O.S.2011, § 2404Miller v. State, 2013 OK CR 11313 P.3d 934overruled on other grounds in Harris v. State, 2019 OK CR 22450 P.3d 933Jones v. State, 1989 OK CR 7772 P.2d 922overruled on other grounds by Omalza v. State, 1995 OK CR 80911 P.2d 286Burks v. State, 1979 OK CR 10594 P.2d 771overruled in part on other grounds by Jones, 1989 OK CR 7772 P.2d 922

¶115 The trial court gave propensity evidence instructions prior to the testimony of witnesses L.F., S.S., C.B., E.D., and A.C., (the living victims of Reece's crimes). The trial court did not give a Burks instruction at the same time. In this proposition, Reece complains about the evidence cited in Proposition Five, as well as evidence relating to the crimes against J.C., L.S., and K.C. (Reece's murdered victims).

¶116 The trial court ruled that the testimony of the five living victims and the three murdered victims would be admissible under § 2404 for purposes such as proof of motive, opportunity, and absence of mistake or accident. The parties agreed that, in order to reduce jurors' confusion, the post-trial instructions to the jury for § 2404 (B) evidence would only specifically address the prior murders and the instructions for § 2413 evidence would be tailored to address the prior living victims.

¶117 Reece complains that the evidence was substantially more prejudicial than probative, and that its purpose was to show that he is a terrible person and therefore deserves to be punished. He claims the evidence was cumulative and the evidence went beyond was necessary to meet the State's burden of proof. See Bryan v. State, 1997 OK CR 15935 P.2d 338

¶118 Reece points to the fact that an inordinate amount of evidence during the first stage concerned other crimes committed by him in comparison to the evidence of the crime against Tiffany Johnson. He claims that the verdict was based on the other acts and not on the evidence of his crime against Tiffany Johnson, thus he claims his due process rights were violated.

¶119 The evidence of Reece's sexual assaults and murders was relevant to show motive, intent, and lack of accident or mistake. It was also relevant to show common scheme or plan. His first two rapes occurred in 1986. He was prosecuted and convicted for those crimes, and he was incarcerated until 1996 when his crimes resumed. In 1997 Reece raped and/or killed seven young women. Reece killed the murder victims by strangulation or breaking their necks, and he dumped and concealed their bodies in remote areas. The surviving victims survived because they submitted to his attacks and promised no retribution. Only S.S. who jumped from the moving vehicle was spared the torture of sexual assault and eventual death.

¶120 By all accounts, Reece is a serial rapist and killer. His pattern of raping and killing connect him to the killing of the victim in this case. The trial court did not abuse its discretion in allowing the evidence. Reece has not shown that any error occurred. Proposition Six is denied.

VII.

¶121 In Proposition Seven, Reece claims that the State was improperly allowed to introduce evidence of his character in violation of 12 O.S.2011, § 2404

¶122 The evidence came in the form of opinion from Ranger Holland and Detective Bacon. Most of the evidence was not met with contemporaneous objections based on improper character evidence, thus we review for plain error only. 12 O.S.2021, § 2104Hogan v. State, 2006 OK CR 19139 P.3d 907Id. (quoting Simpson v. State, 1994 OK CR 40876 P.2d 690

¶123 The singular character evidence testimony from Ranger Holland's first stage testimony regards Holland's opinion about Reece's morality. Holland's testimony concerned his approach to interviewing Reece. He testified that, in his experience, he uses an accused's sense of morality to garner a confession. In this case, however, he believed that the tactic would not work with Reece. He testified that he felt like Reece lacked morality. 

¶124 This testimony regarding Reece's morality and Reece's status and prison perception was used to form an understanding of Holland's game plan, how Holland approached the interviews, and how he was able to gain Reece's trust. Reece's statements formed a major part of the evidence in this case, and the authenticity of the statements were at issue throughout the trial. The method of interrogation, how Holland treated Reece, and their interaction during the interviews were all relevant to show the jury that Reece's statements were credible, and that they were given freely and voluntarily. The trial court did not abuse its discretion in allowing this testimony.

¶125 Reece cites to the fact that Holland was also allowed to testify, on cross-examination, and without a character evidence objection, that Reece did not cry or become emotional when talking about the killing of L.S., Tiffany Johnson, and J.C. 

¶126 Counsel had opened the door by asking Holland, on cross-examination about Reece's emotional state during the interviews; whether he agreed to the second interview in a "shaken voice." Counsel also asked about the February 15 interview, indicating that Reece became emotional during the interview. Holland testified that he put his head down, broke down, and cried. He agreed with counsel that Reece wanted the ordeal to be over with.

¶127 This evidence is not character evidence. Reece has cited no cases to show the evidence was improper. If anything, this evidence was relevant re-direct to develop and clarify the cross-examination questioning. See Luker v. State, 1972 OK CR 360504 P.2d 1238See Smith v. State, 2007 OK CR 16157 P.3d 1155

¶128 Reece cites Holland's testimony, on redirect, that Reece's anxiety over the delay in finding K.C.'s body was based on the fact that authorities were not finding the body in an efficient manner, and Reece wanted people to believe him rather than some deal he might be making to avoid the death penalty. Counsel objected on speculation grounds.

¶129 Counsel had asked Holland, on cross-examination, whether he sensed that Reece was anxious during the search for K.C.'s remains and whether he wanted people to believe him and whether the anxiety was due to his deal to avoid the death penalty. Holland said it was possible. Then on redirect, Holland said it was possible, but not probable. This testimony, like the testimony above, was invited by defense counsel thus he has waived any error in the introduction.

¶130 Next, Reece cites to testimony from Holland about Reece saying that he snapped L.S.'s neck. This testimony was not character evidence. The testimony was based on Reece's confession and whether Reece's statements were reliable regarding the crime against L.S.

¶131 Reece next complains about Detective Bacon's testimony. Bacon testified about Reece's crimes against J.C. Reece told Bacon that it was possible he had sex with J.C., but he could not remember. Bacon was asked if the lack of memory was odd, that Reece could remember every detail of the interaction except the part about whether he had sex or not. Defense counsel objected on relevance grounds.

¶132 This testimony was relevant to show the credibility of Reece's statements. Bacon's observations of Reece's ability to relate past events and his candor were relevant for the jury's consideration of the confession to the instant crime. Smallwood v. State, 1995 OK CR 60907 P.2d 217

¶133 Reece complains about Bacon's testimony about Reece's statements regarding Johnson's murder. Bacon confronted Reece about his statements. Reece had stated that Johnson had initiated a sexual encounter after she had been forced into the horse trailer. Bacon indicated that he believed Reese's statements were implausible. He believed the statements were ridiculous. Counsel objected on relevance grounds. Bacon's confrontation of Reece led Reece to say, "well, I didn't say it was consensual." The testimony was relevant to show the full picture of this interview.

¶134 Next, Reece complains that Bacon was allowed to testify that he didn't believe that Reece was fully truthful during the interviews. This was not character evidence. This testimony occurred during re-direct and was in response to cross-examination about whether Reece's will had been overborne by promises. The testimony was relevant to show inconsistencies in the statements and to determine whether the statements were credible and voluntary.

¶135 Reece also cites to other testimony that was clearly not character evidence. He has not cited any supporting authority to show that the testimony was in error, thus any error is waived. Proposition Seven is denied.

PROSECUTORIAL MISCONDUCT CLAIM

¶136 In Proposition Eight, Reece claims that the incidents of prosecutorial misconduct during closing arguments in both first and second stages of his trial deprived him of his due process right to a reliable sentencing proceeding. Counsel objected during the arguments; thus, we review the trial court's rulings for an abuse of discretion.

¶137 This Court will not reverse a conviction on allegations of prosecutorial misconduct unless the cumulative effect was such to deprive the defendant of a fair trial. Warner v. State, 2006 OK CR 40144 P.3d 838Garrison v. State, 2004 OK CR 35103 P.3d 590Lee v. State, 2018 OK CR 14422 P.3d 782Bramlett v. State, 2018 OK CR 19422 P.3d 788

¶138 Both parties to a trial have wide latitude during closing argument to discuss evidence and reasonable inferences from such evidence. Relief is warranted only where grossly improper comments affect the defendant's right to a fundamentally fair trial. Hanson v. State, 2003 OK CR 1272 P.3d 40

¶139 The prosecutor, during first stage, told the jury, over and over, that Reece was guilty of murdering Tiffany Johnson. Trial counsel objected on the grounds that the prosecutor was stating personal opinion.

¶140 The prosecutor did not preface the statements with "the evidence showed" or some other incantation. Therefore, it might appear that he was stating his personal opinion. The prosecutor, however, never used words such as "I believe" or "in my opinion." Therefore, it is obvious, taken in context that the prosecutor was pointing out to the jury that the weight of the evidence proved that Reece was guilty beyond a reasonable doubt.

¶141 Other similar comments were made in the State's second closing argument after the defense had made its argument pointing out the weaknesses in the State's case. The prosecutor was not stating directly or implicitly that he had knowledge beyond what the evidence showed. The prosecutor began this second argument with "Before I get into evidence that proves that William Reece murdered Tiffany Johnson . . .." His preamble informed the jury that his argument was based on the evidence.

¶142 Just a page before the quotation of the Prosecutor's argument set forth in Reece's brief, the prosecutor says, "Now, I want to talk to you about what the actual evidence is." The prosecutor was merely stating a reasonable inference based on the evidence, not personal opinion, when the prosecutor stated "Tiffany Johnson, why we are here today because law enforcement did not give up and her family did not give up on finding her killer. He's right over there." And later, Reece complains, the prosecutor stated, "his guilt is clear" and "And he kills Tiffany Johnson." All of these statements were reasonable inferences on the evidence that the prosecutor spelled out in closing argument.

¶143 It is entirely proper for a prosecutor to argue for a particular outcome based on the evidence introduced at trial. Underwood, 2011 OK CR 12reasonable inferences from it in their closing arguments." Vance v. State, 2022 OK CR 25519 P.3d 526

Any prosecutor is usually going to tell the jury what he thinks the evidence showed. If his argument is reasonably based on the evidence, there should be no error. Here, the prosecutor is not telling the jury to abandon its duty and convict based on the prosecutor's own opinion. He is simply telling them that the evidence supported a guilty verdict.

Williams v. State, 2008 OK CR 19188 P.3d 208Banks v. State, 2002 OK CR 943 P.3d 390

¶144 If these statements were preceded by the "magical" incantations of "the evidence shows," there would be no issue raised on appeal. Here there is no need for magical incantations inoculating such statements from the prosecutor, because the closing in total was properly based on the evidence presented.

¶145 Reece points out that, during second stage, the prosecutors argued that Reece deserved the death penalty. Again, defense counsel objected and argued the prosecutors were expressing their personal opinion. See Le v. State, 1997 OK CR 55 947 P.2d 535

¶146 It is improper for the State to argue that death is the only appropriate sentence. It is not improper for the State to argue that the penalty of death is the appropriate penalty under the facts of the case. See Pavatt v. State, 2007 OK CR 19159 P.3d 272Id. The arguments of the prosecutor were based on a reasonable conclusion of the aggravating circumstances versus the mitigating evidence. The arguments, in context of the entire closing argument did not amount to error. Proposition Eight is denied.

SECOND STAGE ISSUES

¶147 In Proposition Ten, Reece argues that the State failed to prove that he murdered Tiffany Johnson in order to avoid arrest or prosecution, which requires vacating the "avoid arrest" aggravating circumstance. The evidence must show that Reece killed in order to avoid arrest or prosecution. Myers v. State, 2000 OK CR 2517 P.3d 1021Id. There must be a predicate crime, apart from the killing, for which the defendant seeks to avoid arrest or prosecution. Romano v. State, 1995 OK CR 74909 P.2d 92

¶148 The evidence supporting this aggravating circumstance included the fact that Reece had been arrested and prosecuted for his prior sex crimes in Oklahoma; when interviewed, Reece acknowledged that he began killing because he left prior victims alive and they testified against him; and Reece discussed the fact that if he got rid of a victim's clothing, it was to conceal evidence of his involvement in the crime. The evidence presented in this case, supports a conclusion that the cause of death was strangulation after a sexual assault. This evidence was sufficient for a rational jury to conclude, beyond a reasonable doubt, that he killed Tiffany Johnson to avoid arrest or prosecution. See Myers, 2000 OK CR 25

¶149 In Myers, evidence of the avoid arrest aggravating circumstance consisted of the fact that the victim was beaten, strangled, and smothered or drowned, after a sexual assault. Furthermore, the appellant had been punished following similar incidents. The present case is similar to Myers and supports a conclusion that the evidence in this case supports the fact that this killing was done to avoid arrest or prosecution. Proposition Ten is denied.

¶150 In Proposition Eleven, Reece argues that the heinous, atrocious, or cruel aggravating circumstance is unconstitutionally overbroad. This Court has repeatedly rejected this claim under the same circumstances. Davison v. State, 2020 OK CR 22478 P.3d 462

PREVIOUSLY ADJUDICATED ISSUES

¶151 In Proposition Twelve, Reece asks this Court to reconsider previously adjudicated issues in order to preserve the issues for review in subsequent state and federal proceedings. Reece argues that (1) sentencing-phase jury instructions diminished the effect of mitigating evidence; (2) the trial court should have instructed jurors that they could consider life or life without parole after finding an aggravating circumstance; (3) the instructions permitted the jury to weigh aggravating circumstances against individual mitigating circumstances in violation of statute as well as the Eighth and Fourteenth Amendments; and (4) victim impact evidence has no place in Oklahoma's capital sentencing scheme. This Court has repeatedly rejected substantially similar arguments. Davison, 2020 OK CR 22Mitchell v. State, 2010 OK CR 14235 P.3d 640

¶152 Reece claims, in Proposition Thirteen, that the cumulative effect of individually harmless errors warrants reversal of his conviction or a modification of his death sentence. We have found no individually harmful errors, and further find no accumulation of prejudicial effects from individually harmless errors. Davison, 2020 OK CR 22

MANDATORY SENTENCE REVIEW

¶153 In Proposition Fourteen, Reece argues that his sentence of death should be vacated under our mandatory sentence review authority found at 21 O.S.2021, § 701.13

DECISION

¶154 The Judgment and Sentence is AFFIRMED and Reece's application for an evidentiary hearing is DENIED. Pursuant to Rule 3.15, Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2025), the MANDATE is ORDERED issued upon the delivery and filing of this decision.

APPEAL FROM THE DISTRICT COURT OF OKLAHOMA COUNTY
THE HONORABLE SUSAN STALLINGS, DISTRICT JUDGE

 

 
 
 APPEARANCES AT TRIAL
 APPEARANCES ON APPEAL
 
 
 JACOB BENEDICT
 KRISTEN MESSINA
 ASST. PUBLIC DEFENDERS
 320 ROBERT S. KERR AVE.,
 SUITE 400
 OKLAHOMA CITY, OK 73102
 ATTORNEYS FOR DEFENDANT
 HALLIE ELIZABETH BOVOS
 GUNNER BRISCOE
 ASST. PUBLIC DEFENDERS
 320 ROBERT S. KERR AVE.,
 SUITE 611
 OKLAHOMA CITY, OK 73102
 ATTORNEYS FOR APPELLANT
 
 
 
 JIMMY HARMON
 RYAN STEPHENSON
 ASSISTANT DISTRICT ATTORNEYS
 320 ROBERT S. KERR, SUITE 505
 OKLAHOMA CITY, OK 73102
 ATTORNEYS FOR THE STATE
 
 GENTNER F. DRUMMOND
 ATTORNEY GENERAL
 ASPEN J. LAYMAN
 JENNIFER L. CRABB
 ASST. ATTORNEY GENERAL
 313 N.E. 21ST STREET
 OKLAHOMA CITY, OK 73105
 ATTORNEYS FOR APPELLEE
 
 

OPINION BY LEWIS, J.
LUMPKIN, P.J.: Concur
MUSSEMAN, V.P.J.: Specially Concur
HUDSON, J.: Concur
DARBY, J.: 

FOOTNOTES

 

in ruling on challenges for cause, all doubts regarding juror impartiality must be resolved in favor of the accused, who need not prove a juror's bias in favor of the death penalty with unmistakable clarity. This means trial courts should consider the entirety of a prospective juror's voir dire to determine if their expressed feelings favoring the death penalty would prevent or substantially impair their performance as a juror.

Matthews v. State, 2002 OK CR 1645 P.3d 907Warner v. State, 2001 OK CR 1129 P.3d 569

See Brown v. Illinois, 422 U.S. 590, 604 (1975) (Holding that the burden of showing admissibility rests on the prosecution). See also Brown v. State, 1998 OK CR 77989 P.2d 913 Matthews v. State, 1998 OK CR 3953 P.2d 336

Miranda v. Arizona, 384 U.S. 436 (1966).

Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2025). This motion is not proper under Rule 3.11 and is denied.

Underwood v. State, Case No. F-2001-1048 (Okl.Cr. Dec. 23, 2002).

Walker was interpreting West's Ann.Cal.Evid. Code § 1108; the opinion merely presents persuasive authority and is not binding on this Court.

 

 

MUSSEMAN, V.P.J., SPECIALLY CONCURRING:

¶1 I join the Court's opinion but write separately to address my reservations regarding Propositions V and IX.

¶2 In Proposition V, this Court undertakes review of a novel question regarding admissibility of sexual propensity evidence under Section 2413(D)(4) of Title 12 after finding the same evidence would have likely been admissible under Section 2404(B) of Title 12. However, I retreat from this Court's commentary, and wholly unnecessary dicta, that it is simply Appellant's nature to kill others and derive sexual pleasure or gratification from the act. Rather, this Court should restrain itself to our standard of review and go no further. We should simply state our holding that there was sufficient evidence in the record for the trial court to find Appellant killed the victim in this case, as he killed others, in an effort to derive sexual pleasure or gratification. As a result, the trial court did not abuse its discretion in admitting this propensity evidence under Section 2413(D)(4).

¶3 Turning to Proposition IX, the Court squarely and appropriately addresses Appellant's claim regarding life and death qualification of the jury according to this Court's precedent. I, however, write separately to question that precedent.

¶4 For a juror selected to serve on a capital jury to follow the law in Oklahoma, they must engage in both fact finding and weighing of aggravation and mitigation before having the option of imposing a capital sentence. 21 O.S.2021, § 701.11Witherspoon's footnote 21. Vasquez v. State, 2025 OK CR 1Banks v. State, 1985 OK CR 60701 P.2d 418Davis v. State, 1983 OK CR 57665 P.2d 1186Witherspoon, 391 U.S. at 522 n.21). It is this Court's precedent stemming from its interpretation and application of footnote 21 from Witherspoon that I question today.

¶5 For all non-capital offenses, Oklahoma does not recognize a for cause challenge to a potential juror because of that potential juror's views on punishment. 22 O.S.2021, § 65922 O.S.2021, § 926.1Witherspoon's footnote 21 to support that holding, not Oklahoma statutes. That support has since been eroded and may no longer provide the necessary foundation for this Court's precedent.

¶6 The United States Supreme Court held in Witherspoon that the prosecution could not exclude prospective jurors simply because they voice general objections to capital punishment or indicated they had conscientious scruples against it. Witherspoon, 391 U.S. at 513 14; see also Wainwright v. Witt, 469 U.S. 412, 418 (1985). "Despite Witherspoon's limited holding, later opinions in [the U.S. Supreme] Court and the lower courts have referred to the language in footnote 21, or similar language in Witherspoon's footnote 9, Witt, 469 U.S. at 418. However, the U.S. Supreme Court clarified that the language in footnotes 9 and 21 were dicta and did not constitute the holding of Witherspoon. Id. at 422. Rather, the proper standard to review whether a prospective juror may be excluded for cause because of his or her views on capital punishment is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Id. at 424 (quoting Adams v. Texas, 448 U.S. 38, 45 (1980)).

¶7 The U.S. Supreme Court reiterated this standard in Morgan and held "it is clear from Witt and Adams, the progeny of Witherspoon[,] that a juror who in no case would vote for capital punishment, regardless of his or her instructions, is not an impartial juror and must be removed for cause." Morgan v. Illinois, 504 U.S. 719, 728 (1992). "A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do." Id. at 729. It is precisely "because such a juror has already formed an opinion on the merits, [that] the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror." Id. It is this bias that both Witt and Morgan seek to identify and remove from capital sentencing juries. Not because they can or cannot impose the death penalty or the entire range of punishment, but because they cannot stay true to their oath to follow the law regarding aggravation and mitigation. Witt, 469 U.S. 423. Such a juror would violate both the Sixth and Fourteenth Amendments were he or she to sit on the jury that sentenced a defendant to death. Morgan, 504 U.S. at 728.

¶8 It is from this review of the Witherspoon case and its progeny that I have grown to question this Court's precedent that capital jurors must be willing to consider both sentences of life and life without parole. It appears this Court's rationale stems from the same footnote 21 in Witherspoon the U.S. Supreme Court abandoned as dicta in Witt. Witt, 469 U.S. at 422. Moreover, notably absent from the U.S. Supreme Court's analysis in both Witt and Morgan was any requirement that a juror must consider the entire range of punishment. Yet, this Court's precedent treats them as one and the same, elevating the requirement that a juror must be able to consider each punishment within the entire range not only to a constitutional right, but one so integral to the "very integrity of the legal system, the ChapmanGray v. Mississippi, 481 U.S. 648, 668 (1987).

¶9 More than the questionable foundation supporting our precedent regarding life and death qualification, it is my belief this precedent surrounding life and death qualifying a jury in Oklahoma leads to confusion identifying juror impairment. While I recognize a juror's feelings and attitudes about punishment may inform whether they can maintain fidelity to the trial court's instructions, too often the focus on their views regarding punishment subtly recalibrates the calculus for impairment from the ability to follow their instructions and the law to their likelihood to impose a particular punishment. Witt and Morgan seem to reject this modified view regarding likelihood of a given sentence and instead hold only that a potential juror is not impaired under the Sixth and Fourteenth Amendments as long as he or she is able to set aside their personal convictions and follow the law. With the abandonment of footnote 21 in Witherspoon, the U.S. Supreme Court has distanced itself from any suggestion that a juror must be able to consider every punishment within an entire range. Instead, all that remains is whether a juror is willing and able to follow the law.

¶10 In the context of capital sentencing, Oklahoma law requires a juror to engage in factfinding of aggravating and mitigating circumstances. Then, assuming the jury found at least one aggravating circumstance beyond a reasonable doubt, weigh those circumstances along with any mitigation. Only then, and only if the aggravating circumstance(s) outweigh any mitigating circumstance(s), may the jury then consider the punishment of death in addition to the other statutory penalties of life imprisonment with, or without, the possibility of parole. A juror who can engage in this process is one who's views would not "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath" and satisfies a defendant's right under the Sixth and Fourteenth Amendments to a fair and impartial jury. Witt, 469 U.S. at 424 (quoting Adams, 448 U.S. at 45).

¶11 In light of the foregoing, I believe this Court should reconsider its life and death juror qualification precedent to better align it with Oklahoma law and U.S. Supreme Court precedent in a future case.

FOOTNOTES

Witherspoon opinion is as follows:

Just as veniremen cannot be excluded for cause on the ground that they hold such views, so too they cannot be excluded for cause simply because they indicate that there are some kinds of cases in which they would refuse to recommend capital punishment. And a prospective juror cannot be expected to say in advance of trial whether he would in fact vote for the extreme penalty in the case before him. The most that can be demanded of a venireman in this regard is that he be willing to consider all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings. If the voir dire testimony in a given case indicates that veniremen were excluded on any broader basis than this, the death sentence cannot be carried out even if applicable statutory or case law in the relevant jurisdiction would appear to support only a narrower ground of exclusion. See nn. 5 and 9, supra.

We repeat, however, that nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt. Nor does the decision in this case affect the validity of any sentence other than one of death. Nor, finally, does today's holding render invalid the conviction, as oppose to the sentence, in this or any other case.

Witherspoon v. Illinois, 391 U.S. 510, 522 n.21 (1968).

Witherspoon opinion is as follows:

As the voir dire examination of this venireman illustrates, it cannot be assumed that a juror who describes himself as having 'conscientious or religious scruples' against the infliction of the death penalty or against its infliction 'in a proper case' (see People v. Bandhauer, 66 Cal.2d 524, 531, 58 Cal.Rptr. 332, 337, 426 P.2d 900, 905) thereby affirmed that he could never vote in favor of it or that he would not consider doing so in the case before him. See also the voir dire in Rhea v. State, 63 Neb. 461, 466--468, 88 N.W. 789, 790. Cf. State v. Williams, 50 Nev. 271, 278, 257 P. 619, 621. Obviously many jurors 'could, notwithstanding their conscientious scruples (against capital punishment), return * * * (a) verdict (of death) and * * * make their scruples subservient to their duty as jurors.' Stratton v. People, 5 Colo. 276, 277. Cf. Commonwealth v. Henderson, 242 Pa. 372, 377, 89 A. 567, 569. Yet such jurors have frequently been deemed unfit to serve in a capital case. See, e.g., Rhea v. State, supra, 63 Neb., at 470--471, 88 N.W., at 791--792. See generally Oberer, Does Disqualification of Jurors for Scruples Against Capital Punishment Constitute Denial of Fair Trial on Issue of Guilt?, 39 Tex.L.Rev. 545, 547--548 (1961); Comment, 1968 Duke L.J. 283, 295--299.

The critical question, of course, is not how the phrases employed in this area have been construed by courts and commentators. What matters is how they might be understood--or misunderstood--by prospective jurors. Any 'layman * * * (might) say he has scruples if he is somewhat unhappy about death sentences. * * * (Thus) a general question as to the presence of * * * reservations (or scruples) is far from the inquiry which separates those who would never vote for the ultimate penalty from those who would reserve it for the direct cases.' Id., at 308--309. Unless a venireman states unambiguously that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal, it simply cannot be assumed that that is his position.

Witherspoon, 391 U.S. at 515 n.9.

Witherspoon merely because it involves capital sentencing juries. Witherspoon is not grounded in the Eighth Amendment's prohibition against cruel and unusual punishment . . . ." Witt, 469 U.S. at 423.

Chapman v. California, 386 U.S. 18 (1967).

 
 
 
 
 
 
 
 
 
 The Oklahoma Supreme Court
 2100 N. Lincoln Blvd., Suite 1
 Oklahoma City, OK 73105